838 So.2d 205 (2002)
AMSOUTH BANK f/k/a Deposit Guaranty National Bank
v.
Krishan K. GUPTA and Rishi Enterprises, Inc.
No. 2000-CA-01517-SCT.
Supreme Court of Mississippi.
November 21, 2002.
Rehearing Denied March 6, 2003.
*209 Andrea La'Verne Ford Edney, Robert L. Gibbs, Jackson, attorneys for appellant.
Jan F. Gadow, Ridgeland, Douglas G. Mercier, David Wayne Baria, Jackson, attorneys for appellees.
EN BANC.
COBB, J., for the Court.
¶ 1. This case originated when Dr. Krishan K. Gupta and his closely-held corporation, Rishi Enterprises, Inc. (collectively "Gupta"), filed a complaint in the Hinds County Circuit Court, First Judicial District, against Deposit Guaranty National Bank ("AmSouth").[1] Gupta's complaint sought actual and punitive damages for alleged breach of fiduciary duties, negligent misrepresentation, interference with business relationship, breach of contract, fraud, and breach of duty of good faith and fair dealing.[2] After AmSouth answered, denying all claims, Gupta amended his complaint, adding allegations of breach of duty of disclosure and lack of commercial reasonableness. These new allegations were also denied by AmSouth. Following a trial on the merits, the jury found for Gupta, awarding actual damages of $600,000 and punitive damages of $2.5 million. Accordingly, the trial judge entered a final judgment for $3.1 million on June 30, 2000.
¶ 2. Aggrieved by the final judgment and the denial of its JNOV/new trial motion, AmSouth appeals, assigning as error the following matters (renumbered for clarity):
I. WHETHER THE EVIDENCE WAS UNCONTRADICTED THAT THE SUBJECT PROPERTY CONSISTED OF ONLY 13.73 ACRES, NOT 15.25.
II. WHETHER A REASONABLE JURY COULD HAVE FOUND AMSOUTH LIABLE ON GUPTA'S TORTIOUS INTERFERENCE CLAIM.

*210 III. WHETHER THE EVIDENCE SUPPORTS A CLAIM FOR BREACH OF FIDUCIARY DUTY.
IV. WHETHER THE JURY WAS INADEQUATELY INSTRUCTED ON THE APPLICABLE STANDARD OF PROOF REGARDING BREACH OF FIDUCIARY DUTY.
V. WHETHER THE EVIDENCE SUPPORTS A CLAIM FOR BREACH OF DUTY OF DISCLOSURE.
VI. WHETHER THE EVIDENCE SUPPORTS A CLAIM FOR BREACH OF THE DUTY OF COMMERCIAL REASONABLENESS.
VII. WHETHER THE JURY'S AWARD OF ACTUAL DAMAGES WAS SPECULATIVE AND SHOULD THUS BE REVERSED.
VIII. WHETHER THE TESTIMONY OF GUPTA'S EXPERT WITNESS WAS WRONGLY ADMITTED.
IX. WHETHER A JNOV OR NEW TRIAL SHOULD BE AWARDED ON THE ISSUE OF PUNITIVE DAMAGES.
¶ 3. Although Gupta's claim of negligent misrepresentation went to the jury, and AmSouth includes "negligent misrepresentation" in a single-sentence listing of all Gupta's claims in the summary of argument portion of its brief, AmSouth omits the issue from its headings and makes no further mention of this claim in its brief or its reply brief. It is settled precedent that issues on which a party fails to expend any discussion or citation of authority are not reviewed by this Court. See, e.g., Smith v. Dorsey, 599 So.2d 529, 532 (Miss.1992).
¶ 4. On the issues actually argued by AmSouth, the assignments of error are well taken. The judgment should be affirmed in part (insofar as the uncontested negligent misrepresentation issue is concerned), reversed and rendered in part (insofar as the other liability issues and the issue of punitive damages are concerned), and remanded for a new trial on the actual damages, if any, to be awarded for negligent misrepresentation.

FACTS
¶ 5. On March 18, 1997, Gupta contacted his banker at AmSouth, Renee Rice, about securing a loan to purchase 15.25 acres on Lake Harbour Drive in Ridgeland. On March 25, 1997, Rice and Ken Farmer, a loan officer brought in to assist because of the size of the loan, met with Dr. and Mrs. Gupta at Gupta's office to discuss the $1.3 million loan.
¶ 6. Following this meeting, both of the Guptas phoned Rice and Farmer on several occasions, trying to speed the loan process because the subject property, known as lot 3 J, was "hot" and asking whether the bank needed any additional information. Mrs. Gupta testified that each time she spoke with Farmer, he advised her that it would be another couple of days before their loan was approved.
¶ 7. At some point while Gupta was waiting for AmSouth to process his loan request, he heard that some unspecified buyer was interested in a portion of the property. Gupta phoned Farmer, shared all of this information, and again urged that his loan be processed quickly.
¶ 8. Thereafter, Gupta learned that a local bank and a tire store had purchased a portion of the property. After the sale to the bank and to the tire store, 13.73 acres remained available. However, in Gupta's opinion, a large part of the remaining acreage lacked adequate access to the main *211 street. Therefore, of the remaining 13.73 acres, Gupta was interested in purchasing only 5.345 acres which enjoyed superior access.
¶ 9. A month after the initial discussion of Gupta's loan, Farmer submitted Gupta's loan application to the loan committee on April 24, 1997, and it was approved on that date. Gupta rejected the AmSouth loan and bought the five-acre tract with a loan from Union Planters Bank. He applied for this loan on May 9, 1997, and it was approved May 16.
¶ 10. As it turned out, the "local bank" which purchased a portion of the property was actually AmSouth itself, whose acquisitions department had been planning to buy land on Lake Harbour Drive since December 1996. AmSouth made a firm offer on March 27, 1997 (two days after Gupta's initial meeting with Rice and Farmer), and the deal was closed April 7. On April 23, two AmSouth officers who were involved with the acquisition, and who also sat on the loan committee, received part of Gupta's loan application which referred to purchasing acreage on Lake Harbour.
¶ 11. Gupta argued at trial that AmSouth delayed approval of his loan so that AmSouth could purchase a portion of the subject property before Gupta was able to purchase it himself. AmSouth essentially argued that its purchase of a portion of Gupta's intended acquisition was purely a coincidence.

STANDARD OF REVIEW
¶ 12. This Court reviews denial of a motion for judgment notwithstanding the verdict by considering the evidence in the light most favorable to Gupta, the appellee, giving him the benefit of all favorable inferences that may be reasonably drawn from the evidence. MBF Corp. v. Century Bus. Communications, Inc., 663 So.2d 595, 598 (Miss.1995). Only if the facts and inferences so considered point so overwhelmingly in favor of AmSouth that reasonable persons could not have arrived at a contrary verdict should the motion be granted. C & C Trucking Co. v. Smith, 612 So.2d 1092, 1098 (Miss.1992). Substantial evidence in support of the verdict will require this Court to affirm. Reese v. Summers, 792 So.2d 992, 996 (Miss.2001).

DISCUSSION

I. WHETHER THE EVIDENCE WAS UNCONTRADICTED THAT THE SUBJECT PROPERTY CONSISTED OF ONLY 13.73 ACRES, NOT 15.25.
¶ 13. Because the consistent allegation in Gupta's pleadings was that the dispute centered on a 13.73 acre tract (i.e., on the 3-J lot after AmSouth and the tire store had bought their portions), AmSouth claims that Gupta changed the whole case on the eve of trial by seeking to amend the pleadings to reflect a 15.25-acre tract in dispute (i.e., the lot in its original form). In AmSouth's view, no evidence was offered at trial to show that the 15.25 acres were ever what Gupta sought to buy, so that he was entirely lacking a case: the 13.73 acres he wanted did not include the AmSouth lot. Gupta responds that the 13.73 figure was his counsel's error and that he signed an affidavit including that figure because he trusted his counsel.
¶ 14. AmSouth argues that "proof must conform to the allegations of the declaration. A litigant must not be permitted to base his claim on one theory, and then introduce evidence and recover a verdict, based, in large measure, on an entirely different one." Miss. State Hwy. Comm'n v. Jacobs, 248 Miss. 476, 478, 160 So.2d 201 (1964). In Jacobs, the plaintiff alleged various specific nuisances in his complaint, *212 but at trial he offered evidence that the highway work in question had also caused him damage due to its alleged diversion of water. This Court's holding was based on the injustice of seeking damages on a new issue not alleged in the pleadings. Id.
¶ 15. This Court has also held that pleadings may be amended to conform to the proof, and that leave to do so should be liberally granted as justice may require. Robison v. Robison, 722 So.2d 601, 603-04 (Miss.1998); see Miss. R. Civ. P. 15(b). In this case, Gupta's counsel stated in pretrial conference that he "screwed things up, Your Honor, because I put 13.73 in some of the pleadings and when I caught it, I tried to fix it and Mr. Gibbs [AmSouth's counsel] said you can't do that, it's too late."[3]
¶ 16. In Gupta's deposition, AmSouth asked about the 15.25 figure, and it appears that Gupta's recollection was influenced by his counsel's version of the correct number:
[AmSouth]: And have you done calculations again to see whether or not 1.3 million for 15.25 acres of land would amount to $2.10 per square feet [sic]?
[Gupta]: Bruce Payne did all of the calculations.
By Mr. Baria [Gupta's counsel]:
For the record, I think that the acreage was decreased at 13.73 by the time they got to that point, Robert.
Q. Dr. Gupta, is that your recollection?
A. Well, I say somewhere around 15 or 13 acres, that's what.
. . . .
Q. What I want to make sure I understand, Dr. Gupta, is, there are some contracts in here from Payne Realty that has [sic] 15.25 acres of land where there is $1,000 that is written in and I assume your signature's at the bottom as a buyer. I'll show you that document.
A. It says 15.25 acres, one million dollar offer.
. . . .
Q. So, do youis it your understanding, then, that this particular offer for the 15.25 acres is what was conveyed by Bruce Payne to Mr. Boydston?
A. Yeah, that's my understanding.
Q. And what is your understanding of what a counteroffer was made back to you is [sic] for?
A. Well, I just told you, 25,000 nonrefundable earnest money, and it was 1.3 million, coming around 2.10 square feet.
Q. Are we still talking about 15.25 acres, or an amount of acreage less than that?
A. Whatever Mr. Boydston must have told to Bruce Payne, whatever the land was, actually.
. . . .
Q. All right. But you would agree that at some point the acreage reduced from the 15.25 to around 13 point something; is that right?
A. Yes.
(emphasis added).
¶ 17. While the deposition of Gupta's real estate agent, Bruce Payne, is not before this Court on appeal, his testimony at trial is in the record. On direct, Payne testified as follows:
Q. Was there ever any other offer made by Dr. Gupta for any other *213 part of this property other than for the entire parcel, 15.25 acres, or for this parcel shown right here which is five and a half acres?[4]
A. No, not to my remembrance, ranks [sic].
(emphasis added).
¶ 18. On cross-examination, Payne testified further:
Q. So the 13.73 acres that you have here was acreage that was offered for sale by the McGehees.
A. They would have sold it, yes, but it was the remaining portion after the other two acre tracts [sic] had been sold.
. . . .
Q.... [W]as there ever any other offer from either Dr. Gupta to the McGehees or from the McGehees to Dr. Gupta for 15.25 acres of land?
A. We [Gupta] made the written offer. They verbally rejected the written offer. There was no written counteroffer. Phil Boydston said, "I think I can get the ownershis clientsto accept a one point three million dollar offer on the whole tract."
(emphases added).
¶ 19. AmSouth is thus mistaken in asserting that Gupta's testimony is the only evidence in the record that the 15.25 acres was ever available for Gupta to purchase. A reasonable jury could have believed that the March 15, 1997[5] counteroffer was for the 15.25 acres, because (1) AmSouth had not made a firm offer on its tract until March 27 and (2) the 13.73 acre tract was offered only after AmSouth and the tire store bought their lots.
¶ 20. On the facts of this case, it was not reversible error for the trial court to allow the case to proceed to trial. "[T]he lower court should be cautious in either dismissing a suit or pleadings or refusing to permit testimony.... The reason for this is obvious. Courts are courts of justice and not of form. The parties should not be penalized for any procedural failure that may be handled without doing violence to court procedures." Clark v. Miss. Power Co., 372 So.2d 1077, 1080 (Miss. 1979) (emphasis added). Plainly, had the trial court allowed AmSouth's motion in limine to exclude any mention of Gupta's effort to buy the whole 15.25 acres, that would have amounted to dismissing his case, as AmSouth itself concedes. The better procedure was to let AmSouth impeach Gupta and his witnesses at trial.
¶ 21. This Court has held previously that formal motions to amend the pleadings were prejudicially late at the conclusion of trial. McCarty v. Kellum, 667 So.2d 1277, 1284-85 (Miss.1995). Here, however, AmSouth had reason to be on notice of the variance in the acreage figures before the trial commenced and even before Gupta's counsel tried to repair his error, namely, upon taking the depositions of the agents. Payne's testimony presumably reflects his depositionsAmSouth did not suggest otherwise when it had him on the standand should have put AmSouth on notice of a likely error in the pleadings. *214 Also, Gupta's theory of the case and damages sought never varied; at all times, he clearly asserted that AmSouth purchased part of the land that he had tried to purchase. Finally, AmSouth vigorously argued at trial that substantial evidence proved that Gupta had not made an offer on the 15.25 acres, but failed to persuade the jury. Any prejudice suffered by AmSouth with regard to this issue does not amount to reversible error.
¶ 22. This assignment of error is therefore without merit.

II. WHETHER A REASONABLE JURY COULD HAVE FOUND AMSOUTH LIABLE ON GUPTA'S TORTIOUS INTERFERENCE CLAIM.
¶ 23. AmSouth claims that the evidence presented at trial does not support a finding of tortious interference with business relations, a claim Gupta disputes.
¶ 24. The four elements of tortious interference with business relations, a "cause of action for interfering with a prospective business advantage," Nichols v. Tri-State Brick & Tile Co., 608 So.2d 324, 328 (Miss.1992), are
(1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and (4) that actual damage and loss resulted.
Id. (quoting Galloway v. Travelers Ins. Co., 515 So.2d 678, 682-83 (Miss.1987)). This Court has derived these factors from the similar tort of wrongful interference with contract. Par Indus., Inc. v. Target Container Co., 708 So.2d 44, 48-49 (Miss. 1998). While the tort has its origin in efforts of a third party directed against a plaintiff's customers, Wesley v. Native Lumber Co., 97 Miss. 814, 53 So. 346 (1910), "conduct interfering with the plaintiff may suffice." Nichols, 608 So.2d at 328 n. 4.
¶ 25. Whether the defendant's acts were intentional or willful does not require an outright confession to that effect, but rather may be inferred. Id. at 48 (citing Liston v. Home Ins. Co., 659 F.Supp. 276, 281 (S.D.Miss.1986)). Regarding tortious interference with contract, the district court stated that "the requisite intent is inferred when defendant knows of the existence of a contract and does a wrongful act without legal or social justification that he is certain or substantially certain will result in interference with the contract." Liston, 659 F.Supp. at 281 (quoted in Par Indus., Inc., 708 So.2d at 48) (emphases added). Because the actions for tortious interference with contract and with business relations have identical elements, we can apply the Liston test for intentional or willful conduct to the claim of tortious interference with business: (1) knowledge, (2) action, and (3) substantial certainty.
¶ 26. First is the knowledge requirement, which will suffice to resolve this issue. Gupta offered evidence at trial that two of the same officers who were involved in purchasing the Lake Harbour lot for AmSouth were also on the loan committee that evaluated Gupta's loan application. According to Gupta, the first page of his loan application, on which the location of the desired property appeared, would have been circulated to these officers on April 23, 1997. Yet by Gupta's own time line of events as presented in his brief, the officers "made a quick decision to purchase a portion of 3-J" on March 24 or 25, 1997, a month before receiving notice that Gupta was considering buying the larger tract that included the portion the bank wanted. *215 On March 25, Gupta's loan application was not even complete. The Guptas had just had their first meeting with Farmer, the officer who would oversee their application, and supplied him with various financial information which Gupta does not allege was anything other than necessary for evaluating his application.[6] AmSouth offered a loan contract on March 27 and finalized the same on April 7, two weeks before Gupta alleges that anyone on the loan committee would have known that AmSouth's own customer was interested in the same property.
¶ 27. Gupta further argues that the requisite knowledge should be imputed to AmSouth as a matter of law based on Farmer's "actual notice." The authority which he cites defines actual notice in these terms:
actual notice often means knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably prudent persons to investigate and ascertain as to the ultimate facts, and it may include knowledge of all facts which a reasonable inquiry would have disclosed. Actual notice is implied only when the known facts are sufficiently specific to impose the duty to investigate further and when such facts furnish a natural clue to the ultimate fact. Implied notice arises from an inference of fact.
King Lumber Indus. v. Cain, 209 So.2d 844, 848 (Miss.1968) (emphasis added).
¶ 28. Gupta himself agreed only that he was "at some point made aware that somebody else was interested in the property" (emphasis added) and that he told this to Farmer. That is simply not enough to support a finding of notice to Farmer that a "local bank" was seeking to buy the land. The only mention of the "local bank" is that "somewhere in the process I [Gupta] learned from Bruce Payne that this piece of property had been bought by a local bank and tire store. I don't remember what date." (emphasis added). Besides Gupta's confessed inability to recall the date, his own recollection is that he learned of the "local bank" only after the sale was complete.[7]
¶ 29. AmSouth offered the loan contract on March 27 and closed on April 7. On cross, Gupta's counsel asked Farmer whether he heard from Gupta "between March 25 and April 24th" about a local bank's being interested in 3 J, and Farmer said that he did. While this may well have placed Farmer on actual notice, no evidence was offered to support the claim that this actual notice was given before AmSouth closed on the property, after which the notice would have been moot. Merely alleging what Farmer knew or should have known sometime over the *216 course of one month, in a case where specific dates are crucial, will not support a finding that AmSouth actually was on notice before it closed on the property particularly where Gupta's own recollection, more specific than Farmer's, is that he learned of a bank's being involved only when the deal had already been closed.
¶ 30. Because the evidence at trial did not meet the knowledge prong of the test for tortious interference, a reasonable jury would have had no basis for finding for Gupta. The trial court committed reversible error in denying AmSouth's motion for J.N.O.V. on this issue.

III. WHETHER THE EVIDENCE SUPPORTS A CLAIM FOR BREACH OF FIDUCIARY DUTY.
¶ 31. AmSouth argues that it owed no fiduciary duty to Gupta and that, even if it did, it did not breach any such duty. Gupta counters that the jury correctly found that a fiduciary duty existed, and that AmSouth breached it by deliberately holding up his loan with the intent of acquiring its portion of 3-J before Gupta could purchase the lot.
¶ 32. A fiduciary relationship does not automatically exist in a commercial loan transaction. See, e.g., Hopewell Enters., Inc. v. Trustmark Nat'l Bank, 680 So.2d 812, 816 (Miss.1996); Peoples Bank & Trust Co. v. Cermack, 658 So.2d 1352, 1358 (Miss.1995) ("ordinarily a bank does not owe a fiduciary relationship to its debtors and obligors under the U.C.C."). However, this Court has held that under some circumstances a debtor may prove its existence. Lowery v. Guar. Bank & Trust Co., 592 So.2d 79, 83-85 (Miss.1991). The party asserting the existence of a fiduciary relationship bears the burden of proving its existence by clear and convincing evidence. Smith v. Franklin Custodian Funds, Inc., 726 So.2d 144, 150 (Miss. 1998). We use a three-part test for determining whether a fiduciary relationship exists in a commercial transaction: whether (1) the parties have shared goals in each other's commercial activities, (2) one of the parties places justifiable confidence or trust in the other party's fidelity, and (3) the trusted party exercises effective control over the other party. Id. at 151 (citing Cermack, 658 So.2d at 1359).
¶ 33. Although Gupta argues that his dealings with AmSouth meet this test, we do not agree. To do so would effectively extend the mantle of the fiduciary relationship over every loan-application transaction. It is true that both Gupta and AmSouth hoped to profit from the loan, but that is a feature common to every free-market transaction. Gupta also trusted AmSouth to expedite his loan as quickly as possible; but don't almost all borrowers wish their loans were processed sooner?[8] Certainly, AmSouth's officers were more familiar with loan processes than was Gupta, and their approval or denial of his loan would "control" whether or not he could attempt to carry out his plan, but again, this is a feature of every loan application. "While one normally does not enter into a contract with another unless he trusts and has confidence in him, contract and debt amount to a business and not to a fiduciary relationship." Cermack, 658 So.2d at 1358 (quoting Bogert, The Law of Trusts and Trustees § 17, at 219 20 (2d ed.1984)). "[T]he severity of the burdens and penalties that are integral to a fiduciary relationship," id., should not apply to ordinary commercial loan applications.
¶ 34. Gupta's argument for a fiduciary relationship appears to rest most heavily on Lowery, which is clearly distinguishable *217 from the present case. In Lowery, the plaintiff and her husband had dealt repeatedly with one bank officer who arguably created the impression that he was willing to bend the rules or make exceptions for the Lowerys' special circumstances, and who failed to tell Mrs. Lowery that these apparent exceptions would not preserve their credit life insurance. This Court recognized that "a fiduciary relationship could have been created from the Lowerys' dealings with Guaranty Bank aside from the note." Lowery, 592 So.2d at 85 (emphasis added). No genuine issue of material fact as to the existence of a fiduciary relationship arose in Lowery from the debtor/creditor relationship itself ("the note"); rather, it was the Lowerys' history of dealings with the bank, and the bank's creation of a special arrangement, that instilled trust in Mrs. Lowery that the arrangement would not deviate from the prior one in a manner detrimental to her interests. Id.
¶ 35. By contrast, Gupta had no special dealings with AmSouth aside from his ordinary transactions. He was not even dealing with the officer who had handled his previous matters, but instead he dealt with a stranger, Farmer. Further, AmSouth did nothing out of the ordinary that could create a fact issue as to whether a fiduciary relationship had arisen.
¶ 36. If Gupta had been able to show that AmSouth did bid on and acquire the property after learning of his interest in it, the question of a fiduciary relationship might well be before the Court. Cf. Dolton v. Capitol Fed. Sav. & Loan Ass'n, 642 P.2d 21, 24 (Colo.Ct.App.1981). In Dolton, the plaintiff alleged that the bank officer learned of his intent to buy the land and told him that the bank had planned at one time to buy the land itself, but that it no longer had that intention. 642 P.2d at 22. Soon thereafter, the bank's real-estate subsidiary bought the property. Id. The Colorado court held that summary judgment for the bank was inappropriate because a fiduciary relationship might have been created. Id. at 23-24. But in Gupta's case, no comparable assurance was offered him by the bank, so that he had no reasonable basis on which to "relax the care and vigilance ... ordinarily exercised in dealing with a stranger." Id. at 23.
¶ 37. Because no fiduciary relationship arose, no breach occurred. In any event, as we have noted under Issue II, there is no evidence that AmSouth's officers were in a position to have realized the connection between their acquisition and Gupta's loan until after the deal had been concluded.
¶ 38. We conclude that no genuine issue of fact existed regarding a fiduciary relationship; thus, it was reversible error to let the issue go to the jury.

IV. WHETHER THE JURY WAS INADEQUATELY INSTRUCTED ON THE APPLICABLE STANDARD OF PROOF REGARDING BREACH OF FIDUCIARY DUTY.
¶ 39. This issue is rendered moot by our holding on the preceding assignment of error.

V. WHETHER THE EVIDENCE SUPPORTS A CLAIM FOR BREACH OF DUTY OF DISCLOSURE.
¶ 40. AmSouth argues that there because there was no fiduciary relationship between it and Gupta, there was no duty to disclose. Gupta counters that a duty to disclose may exist independently of a fiduciary duty.
¶ 41. This Court has held that in the mortgagor-mortgagee relationship, a degree of trust or a duty of fairness owed by one party to another carries with it a duty *218 to disclose facts peculiarly within one party's knowledge when failure to disclose may result in harm to the other party. First Am. Nat'l Bank of Iuka v. Mitchell, 359 So.2d 1376, 1380 (Miss.1978). In that case, the bank officer was using the threat of foreclosure to pressure mortgagors to sell their property for below market value to a purchaser whom he had chosen. Id. at 1378. This Court held that the bank had a duty to disclose the fact within its knowledge that the property could be sold for more than it had induced the mortgagors to accept. Id. at 1380. Citing an Arizona court decision, this Court said that there
may be a fiduciary relationship between the bank and its mortgagor due to the character of a bank and their giving of financial advice over the years.... [B]anks are seeking people's trust and confidence and therefore may owe clients a high degree of care. We hold here that FANB at least owed its mortgagors, the Mitchells, a duty of fairness which it violated.
Id. (citing Stewart v. Phoenix Nat'l Bank, 49 Ariz. 34, 64 P.2d 101 (1937)).
¶ 42. Gupta, however, has not created a fact issue as to AmSouth's having done anything which sank to the level of the conduct in Mitchell. As shown under Issue II above, the record does not support the notion that AmSouth had the relevant facts "within its knowledge" prior to purchasing the property. No evidence supports any breach of a duty to disclose by AmSouth. Thus, it was error to submit this issue to the jury.

VI. WHETHER THE EVIDENCE SUPPORTS A CLAIM FOR BREACH OF THE DUTY OF COMMERCIAL REASONABLENESS.
¶ 43. This case raises the question of whether "breach of commercial reasonableness" even exists as an independent tort in Mississippi. Gupta's legal authority on this issue is tenuous: a Mississippi Court of Appeals decision regarding the U.C.C. and the "reasonable commercial standards" defense to conversion claims under section 3-419(3) of that Code. Delta Chem. & Petroleum, Inc. v. Citizens Bank of Byhalia, 790 So.2d 862, 875 (Miss.Ct.App.2001); see Miss.Code Ann. § 75-3-419(3) (affirmative defense to conversion claims is that bank acted within "reasonable commercial standards"). Nothing in Delta Chemical, however, supports the existence of a free-standing tort of breach of commercial reasonableness outside the highly specific context of certain U.C.C. provisions, none of which Gupta cites as pertinent to his attempted transaction with AmSouth. We do not see any reason to expand our case law so as to make "commercial unreasonableness" per se a tortious act.[9]
¶ 44. What Gupta's claim seems to be, is that Union Planters Bank's quicker response to his loan application is further circumstantial evidence of AmSouth's bad faith in holding his application long enough to secure the property for itself. However, as shown above, the transaction was concluded before Gupta has alleged that anyone at AmSouth was in a position *219 to put two and two together. This rather dubious example of a second bank's speedy resolution of a completely different loan, for a much smaller amount and upon completely different collateral, simply is irrelevant to the case.
¶ 45. No evidence was presented to show AmSouth's breach of any duty of commercial reasonableness, or even that such a legal duty even existed on the authority supplied to this Court. It was therefore reversible error to submit this issue to the jury.

VII. WHETHER THE JURY'S AWARD OF ACTUAL DAMAGES WAS SPECULATIVE AND SHOULD THUS BE REVERSED.

VIII. WHETHER THE TESTIMONY OF GUPTA'S EXPERT WITNESS WAS WRONGLY ADMITTED.
¶ 46. Because AmSouth did not assign error on the negligent misrepresentation count, we now proceed to the issues relating to damages. The two issues listed above are logically intertwined: if Gupta's expert's testimony was wrongly admitted, that testimony cannot be considered as an adequate basis for the jury award. Thus we consider the propriety of admitting the expert's supplemented report before turning to the validity of the award.

A. Was Wingfield's testimony admissible?

¶ 47. AmSouth argues that the supplemented testimony of Gupta's expert, Randall Wingfield (an independent real estate appraiser), should have been excluded on two grounds: first, that there was a discovery violation regarding disclosure of the supplemented report to AmSouth; and second, that Wingfield's testimony was defective in that it "was inadequate and served only to confuse the jury as to the proper measure of damages." However, in both its initial and reply briefs, AmSouth fails to supply argument or authority regarding the latter assignment of error. As already stated, AmSouth must conform to this Court's established practice and actively pursue its assignments of error if it wishes them to be considered on appeal. Therefore, we review only the allegation of a discovery violation by Gupta.
¶ 48. AmSouth complains that Wingfield's report was provided to it only on "the eve of trial." This appears to mean the Friday before the Tuesday, May 30, 2000, on which the parties filed their pretrial motions. The trial itself began June 26, 2000.[10] On May 30, the trial judge acknowledged his concern regarding the short notice to AmSouth and offered twice to let AmSouth depose Wingfield. Both times, AmSouth's counsel declined: (1) "No, Your Honor, I'm not prepared. We've got a trial we're starting today and I'm ready to go to trial.... I'm sure I could take his deposition and get it but then I'm going to have to hire an expert which will delay us to try to talk about this"; (2) "Judge, I don't plan to take his deposition because I don't see where I have the time to do it and effectively try the case." AmSouth did not request a continuance. Indeed, it had opposed an unrelated one.
¶ 49. According to AmSouth's May 30, 2000, motion in limine seeking to exclude Wingfield's testimony, he was designated as an expert witness in October 1999, and apparently a timely report of his, evaluating *220 Gupta's damages in terms of a 13.73 acre parcel, was duly provided to AmSouth. The supplementation which AmSouth claims to be untimely and prejudicial appears, on AmSouth's own account, to differ only in changing the report to fit the 15.25 acre figure that Gupta's counsel had lately realized was accurate.
¶ 50. The alleged prejudice surrounding this supplementation was that AmSouth had built "its entire defense" around the 13.73 acre figure, as addressed under Issue I, above. As a separate category of supposed prejudice, AmSouth cites the substance of Wingfield's testimony on investment value, but it appears from the record that no previously-unanticipated testimony on this topic was offered at trial (see the discussion in subsection B of this issue).
¶ 51. The guiding consideration in reviewing whether seasonable supplementation took place is the degree, if any, of "unfair surprise" to the aggrieved party, such that the party was subjected to "trial by ambush." Blanton v. Bd. of Supervisors of Copiah County, 720 So.2d 190, 195-96 (Miss.1998). "[S]easonableness must be determined on a case by case basis looking at the totality of the circumstances surrounding the supplemental information the offering party seeks to admit." Id. at 196. Where "the issue upon which the expert was to testify was narrow and could be quickly dealt with, ... ten days was enough to allow the opposing party to deal with the testimony." Motorola Communications & Elecs., Inc. v. Wilkerson, 555 So.2d 713, 718 (Miss.1989). The standard of review is for abuse of discretion. Eastover Bank for Sav. v. Hall, 587 So.2d 266, 272 (Miss.1991). Declining the opportunity to depose the witness in question may waive any claim of unfair prejudice, Miss. Valley Gas Co. v. Estate of Walker, 725 So.2d 139, 148 (Miss. 1998), as may failing to seek a continuance. Nichols v. Tubb, 609 So.2d 377, 386-87 (Miss.1992); see Wilkerson, 555 So.2d at 718 (neither continuance nor deposition sought).
¶ 52. As we have previously stated, AmSouth had no genuine reason to be startled at this point about Gupta's correction of 13.73 acres to 15.25 acres, with the consequence that Gupta's expert would consequently be changing one of the factors in his multiplication. Moreover, despite AmSouth's claim that its entire case was predicated on the 13.73/15.25 discrepancy, it not only failed to seek a continuance but actually opposed the trial court's granting one on an unrelated matter. This behavior is not consistent with genuine surprise or prejudice, which logically would have led to AmSouth's requesting as much time as possible to repair the case.
¶ 53. Given the minimal prejudice to AmSouth and the fact that AmSouth rejected any practical remedies for the late supplementation, we agree that the trial court did not abuse its discretion in admitting Wingfield's testimony regarding the 15.25 acres' value.

B. Was the jury adequately instructed on damages?

¶ 54. AmSouth contends that the jury instruction on damages was too vague and imprecise to sufficiently guide the jury, so that giving the instruction was reversible error. Gupta responds that sufficient proof of injury to him was put on, and thus the damages were not speculative. Much of AmSouth's proof of its assignment of error rests upon the supposed deficiencies in the evidence offered by Wingfield.
¶ 55. AmSouth cites this Court's holding that an instruction allowing the jury to consider "[a]ll damages, if any, which will be caused as a result of business interruption *221 during permanent repairs made to the building" was reversible error because it "furnishe[d] no guide to the jury to be used in awarding damages for these items." Dickerson Constr. Co. v. Process Eng'g, Inc., 341 So.2d 646, 653 (Miss.1977) (quoting Copiah Dairies, Inc. v. Addkison, 247 Miss. 327, 338, 153 So.2d 689, 694 (1963)). In Addkison, the fault lay in the failure of the instruction to provide the jury with any guidance beyond simply "anything mentioned in the evidence." 247 Miss. at 337, 153 So.2d at 693.
¶ 56. Gupta cites a case in which this Court upheld what he calls a "substantially similar" instruction. Purina Mills, Inc. v. Moak, 575 So.2d 993, 996 (Miss.1990). There, an instruction on "any future expenses" related to the injury or "loss of future profits, if any," without further explication in the text of the instruction, was deemed adequate because the testimony at trial was sufficient for the jury to determine these damages. Id. In that case, the just-quoted language was read by the Court in conjunction with another instruction which stated that
If the cause of the injury is reasonably certain, you may reasonably estimate the damages. Although the lack of a perfect measure does not preclude recovery, you must not guess or speculate. The plaintiffs must give you a reasonable basis on which to base your estimate of damages.
Id.
¶ 57. In the present case, instruction P 9 said that damages "must be shown with reasonable probability both as to their nature and as to their cause.... If the cause of the injury is reasonably probable, you may reasonably estimate the damages, and the assessment thereof is within your discretion." This language appears sufficiently close to that approved in Moak. The question then becomes whether the evidence provided a reasonable basis for determining damages.
¶ 58. AmSouth argues that Wingfield's report failed to adequately show loss of investment and profits. This Court has held that evidence of lost future profits is inadequate where based only upon gross profits without taking expenses into account. Fred's Stores of Miss., Inc. v. M & H Drugs, Inc., 725 So.2d 902, 915 (Miss.1998). In Fred's, this Court cited a Mississippi federal district court opinion, applying our law, which defined net profits as "the gross amount that would have been received pursuant to the business or investment that was interrupted by a defendant's wrongful act, less the cost of running the business or attempting the investment." Id. at 914 (quoting Cook Indus., Inc. v. Carlson, 334 F.Supp. 809, 817 (N.D.Miss.1971)) (emphasis added). Future profits must also be discounted for present value. Stephens v. Brock, 568 So.2d 702, 704 (Miss.1990). Inflation must likewise be taken into account. Lovett v. E.L. Garner, Inc., 511 So.2d 1346, 1353 (Miss.1987).
¶ 59. Without having Wingfield's report before the Court, we infer the facts surrounding this assignment of error from the record. AmSouth alleged at pretrial that "we haven't had any information on investment value, loss of prospective business opportunity." Gupta claimed that the loss of investment value was simply determinable by subtracting the price for which Gupta could have bought the property in 1997 from its present value, and that AmSouth had notice that Wingfield would discuss past and present values. AmSouth properly responded that the issue was more complex:
[Gupta]'s got to have an economist who's going to come in this court and talk about this $1.3 million dollar loan, how much interest he was going to *222 pay, how that was going to be calculated, and then he's going to have to do the same thing with these properties. It's not a measure of damages that it was going to be $1.3 million in 1997 and this property is valued at about $2.3 million. Then he's got to subtract out what Dr. Gupta bought because Dr. Gupta bought about five acres. Then he's got to look at the fact that seven acres are still on the market by the same sellers from before. It's no way that a real estate person can make those calculations and give that opinion to a jury.... What [Gupta] wants a jury to believe is that if that's what this would bring today, that's what his damages ought to be. That can't be a measure of damages because it does not consider the fact that had he gotten the loan that he claims he didn't get, you've got to subtract that out. You've also got to calculate the interest and you've got to look at the factors from 1997 until today. You can't do that with a real estate guy. You've got to have an economist.
(emphasis added).
¶ 60. Wingfield's actual testimony on direct amounted to saying that the discounted current value of the 15.25 acres was $2,162,000 ($3.25/sq.ft.). He explained his procedure of discounting to present value in order to take account of the time it would have taken to sell the property. Wingfield also stated that the difference between present value and what Gupta would have paid came out to $766,761.
¶ 61. It is clear that this evidence does not meet this Court's standard for "loss of profits" (which in the present case would be synonymous with "loss of investment value," a term which we have not employed in this context). AmSouth's assertion that Gupta needed an economist as well as a "real estate guy" is correct.
¶ 62. Thus, we find that this assignment of error is well taken, and we reverse the award of compensatory damages, remanding for a new trial on compensatory damages alone (deriving from the unappealed finding of negligent misrepresentation), consistent with this opinion.

IX. WHETHER A JNOV OR NEW TRIAL SHOULD BE AWARDED ON THE ISSUE OF PUNITIVE DAMAGES.
¶ 63. AmSouth cites two errors regarding the punitive damages awarded. First, it contends, the trial court should not have issued a bifurcated-trial instruction before the jury deliberated upon liability and actual damages. Second, AmSouth argues that punitive damages were wholly improper on the causes of action alleged and that the issue should not have gone to the jury at all.

A. Was the bifurcated-trial instruction properly given?

¶ 64. The instruction in question, C 8, reads as follows:
You are instructed that this is a bifurcated trial. Therefore, before you can consider the issue of punitive damages, if any, which should be awarded to the Plaintiff, you must first decide whether or not the Plaintiff is entitled to receive compensatory damages. At this point in the trial, you are not to consider punitive damages.
After you have reached a verdict on the issue of compensatory damages, and if that verdict is in favor of the Plaintiff, you may hear additional evidence on the issue of punitive damages. Then, and only then, are you to consider the issue of punitive damages.
AmSouth alleges error on five grounds. (1) Since a trial does not become "bifurcated" until after a compensatory award has *223 been made, to instruct the jury "this is a bifurcated trial" amounts to instructing it that there will be a punitive damages award. (2) The instruction brought punitive damages to the jury's attention at an inappropriate stage in its deliberations. (3) The words "should be," in the second sentence quoted above, implied that the jury "should" award punitive damages. (4) The words "[a]t this point in the trial" implied that the jury would be able to "consider punitive damages" later if it awarded compensatory damages. (5) The instruction amounted to a "road map" telling the jury what it had to do if it wanted to award punitive damages.
¶ 65. Gupta responds that (1) the instruction actually does the opposite, removing punitive damages from what the jury may consider; (2) the instruction explicitly removes punitives from the jury's mind rather than inserting them; (3) the language of the instruction will not support AmSouth's construction here; and (4 & 5) the trial court, not the jury, had the power to permit a subsequent punitive damages instruction, so the present instruction did not tell the jury that it could bring about punitive damages by awarding compensatory damages.
¶ 66. Neither side cites case authority for the validity vel non of the instruction. The relevant portions of the Mississippi Code are as follows:
(b) In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages. (c) If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing before the same trier of fact to determine whether punitive damages may be considered.
Miss.Code Ann. § 11-1-65(1) (2002) (emphasis added).
¶ 67. The spirit, and arguably the plain language, of section 11-1-65 requires that the subject of punitive damages not even be brought into the jury's mind as it deliberates upon compensatory damages. It is premature for the trial court to begin talking about a "bifurcated trial" when the trial ultimately may not be bifurcated.
¶ 68. At the instruction conference, the trial court gave its rationale for Instruction C 8:
... I've done that instruction for the past five years because when the legislature first said we had to do bifurcated proceedings, we didn't tell the jury and you can imagine how they feel when they go out and they render a verdict and everything they've ever heard in their lives about the system would indicate that once they render a verdict their work is done. And then we say, oh, we didn't tell you now that we're done with that, we have some more work we need you to do.
(emphasis added). While this concern for the jury's feelings is admirable, it does not justify premature introduction of the issue of punitive damages. Furthermore, after the jury's finding of liability and actual damages and during the court's discussion with counsel, the trial court made a troubling comment: "Well, I made that determination [to allow the jury to consider punitive damages] when I decided to give the bifurcated instruction. I made a determination that I would let the jury consider that." (emphasis added).
¶ 69. A conflict clearly exists between the trial court's last-quoted statement and the text of section 11-1-65(1)(c): "If, but only if, an award of compensatory damages has been made against a party, the *224 court shall promptly commence an evidentiary hearing before the same trier of fact to determine whether punitive damages may be considered" (emphasis added). Obviously, if the trial court made this determination before the jury returned its first verdict, he committed error. But this goes to the trial court's interpretation of the instruction under review, not to the instruction's intrinsic correctness. (See discussion below under subissue B.)

B. Was the issue of punitive damages properly before the jury?

¶ 70. AmSouth argues that, even if it was properly found liable on all counts, punitive damages were not warranted, an argument that Gupta naturally disputes.
¶ 71. The jury may consider punitive damages only where the plaintiff has shown by clear and convincing evidence that the defendant "acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss.Code Ann. § 11-1-65(1)(a) (2002). "Punitive damages are only appropriate in the most egregious cases so as to discourage similar conduct and should only be awarded in cases where the actions are extreme." Malone v. Capital Corr. Res., Inc., 808 So.2d 963, 969 (Miss.2002) (citing Paracelsus Health Care Corp. v. Willard, 754 So.2d 437, 442 (Miss.1999)). The conduct reprehended must be "willful, malicious, or reckless." Id. It is for the trial court to determine whether or not the issue of punitive damages may be submitted to the jury. Miss.Code Ann. § 11-1-65(1)(d).
¶ 72. In the present case, the trial court acknowledged that it had decided to allow the jury to consider punitive damages even before the jury returned its verdict on liability and compensatory damages. This was clearly error. This Court need not determine whether it was reversible error, since punitive damages are clearly inappropriate upon remand of the case.
¶ 73. The only issue before the new jury on remand will be whether, and to what extent, damages are merited by the previous jury's unappealed finding of negligent misrepresentation. The record does not support a finding that AmSouth's conduct was willful or malicious, since no proof was offered that the bank's acquisitions officers were in any position to know of Gupta's interest in lot 3-J until after the bank had closed its purchase. Certainly there was no "clear and convincing" proof as required by statute. This leaves the theory that AmSouth was somehow grossly negligent, egregious, and extreme in failing to have a system in place to prevent its ever acquiring property that was the subject of a client's loan application. The trial court properly found this theory implausible:
As to the should have known, I didn't hear any expert say that they had some obligation to share from a loan officer information with someone else in the acquisitions department regarding parcels. Which is to say that if someone walks into a branch and seeks money to make a purchase on a parcel of property, under your theory the loan officer, whenever anybody attempted to buy any property, the loan officer would have an obligation to make the acquisitions department at the bank aware of that customer's intent to purchase property and then the acquisitions department would have to cross-reference that list against any list of possible potential acquisitions for the bank and make a determination that that customer was not interested in any parcel which coincided with some interest that the bank may have had. That's the thread upon which, in my *225 opinion, the case hangs based on your theory of knew or should have known. And that's a very tenuous thread.
(emphasis added). We agree. In the absence of any proof that commercial lenders regularly do maintain such a system of cross-referencing, the failure to institute that system is not reckless or gross behavior warranting punitive damages.
¶ 74. We therefore reverse and render the award of punitive damages.

CONCLUSION
¶ 75. We affirm the trial court on issue I and on the admission of Gupta's expert testimony. Based on all issues of liability and damages properly appealed to this Court, we reverse the judgment of the trial court and render for AmSouth. Because there remains the count of negligent misrepresentation which AmSouth did not contest, we remand this case for a new trial on compensatory damages on that count alone, in accordance with this opinion.
¶ 76. AFFIRMED IN PART; REVERSED & RENDERED IN PART; REVERSED & REMANDED IN PART.
PITTMAN, C.J., SMITH, P.J., AND WALLER, J., CONCUR. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE, P.J. CARLSON AND GRAVES, JJ., NOT PARTICIPATING.
DIAZ, J., dissenting:
¶ 77. I respectfully dissent from the holding of the majority that actual damages were incorrect and punitive damages were unwarranted.
¶ 78. The majority holds that the actual damages that the jury awarded Gupta in this case were incorrectly founded. However, Gupta presented an expert witness in the field of land appraisal and development, Randall Wingfield, who testified that Gupta sustained actual damages. AmSouth Bank had the opportunity to fully cross-examine this witness. After hearing the evidence, the jury decided that actual damages of $600,000 were warranted. "If the damage is certain, the fact that its extent is uncertain does not prevent a recovery." Adams v. U.S. Homecrafters, Inc., 744 So.2d 736, 740 (Miss.1999). "If the evidence provides adequate data for an approximate estimate of the amount of damages, that is adequate." Id. at 740. Gupta put on proof that the actual damages incurred were equal to the higher price per acre he was forced to pay for the property and the lost profits on the land. Neither of these amounts are speculative. A jury is qualified to award the amount of damages it determines to be appropriate based on the evidence presented. The actual damages awarded by the jury should be upheld.
¶ 79. I further disagree with the reversal of punitive damages in this case. One cannot steal from another with the right hand and then claim that the left hand had no knowledge of it, all the while proclaiming innocence. Regardless of whether one is dealing with the acquisitions department, the loan department, or the savings department, AmSouth Bank is a single entity. AmSouth Bank was either aware or should have been aware of this conflict which is a clear example of gross negligence and is enough warranting punitive damages.
¶ 80. Gupta approached AmSouth and met with Renee Rice on March 18, 1997. He then met with another agent of AmSouth, Ken Farmer, a couple of days later on March 25, 1997. AmSouth then made a firm offer on this particular land two days *226 after Gupta had met with Farmer. AmSouth has the duty to make sure it is not stepping on its customers' toes, while trying to help them walk. When you have a bank who, as part of its business, makes loans to purchase land, it would only be fair to assume that a customer who puts all their purchasing power into the bank by relying on it for funding does not have to worry about that bank interfering with their ability to buy that particular land.
¶ 81. Furthermore, the jury instruction pertaining to damages did not prejudice AmSouth. This instruction, if anything, aided AmSouth by protecting the Bank from the jury incorrectly considering punitive damages before they were warranted. The instruction was clearly worded to emphasize that the jury should not consider punitive damages unless it first found that actual damages are warranted. While the majority relies in part on the Miss.Code Ann. § 11-1-65 (2002), it overlooks the true intent of the statute. Miss.Code Ann. § 11-1-65(1) states in pertinent part:
(b) In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what amount, before addressing any issues related to punitive damages.

(c) If, but only if, an award of compensatory damages has been made against a party, the court shall promptly commence an evidentiary hearing before the same trier of fact to determine whether punitive damages may be considered.
(emphasis added).
¶ 82. This statute simply states that before the jury can consider issues to determine whether punitive damages are called for, it must first whether compensatory damages are to be awarded. Informing the jury of the correct order of its deliberations was not error. The majority also notes the trial judge's comment, "Well, I made that determination [to allow the jury to consider punitive damages] when I decided to give the bifurcated instructions. I made a determination that I would let the jury consider that." While this may initially appear to be a damning comment, when considered in light of the instruction given it had no effect whatsoever on the trial. The judge decided to let the jury consider punitive damages, but said nothing to the effect that it should award punitive damages. He actually went out of his way to clarify that it should not consider punitive damages unless it first got past the actual damages issue. The judge's decision to allow the jury to consider punitive damages had no effect on the jury's decision that they were warranted or their amount.
¶ 83. Because the actual damages were correct, the punitive damages were justified, and the jury instruction was, in no way, prejudicial to AmSouth, I respectfully dissent and would affirm the damages awarded in the trial court.
McRAE, P.J., JOINS THIS OPINION.
NOTES
[1] Deposit Guaranty National Bank was the named defendant initially, but subsequently DGNB was acquired by AmSouth Bank.
[2] The latter three were later voluntarily dismissed.
[3] Gupta's counsel also claimed that both the real estate agents involved "say unequivocally the offer made was on 15.25 acres," a claim that AmSouth's counsel did not dispute at conference.
[4] The 5.5 acres referred to are those which Gupta ultimately bought for his clinic.
[5] This and other dates regarding the offers and counteroffers are taken from the table of dates in Gupta's brief, pp. 12-13. Although the table gives citations to the record, these citations do not always lead to the proffered dates. We consider that, where any uncertainty exists, Gupta is least likely to be prejudiced by our accepting on faith his own version of the relevant chronology. However, even on that version, his claim ultimately fails.
[6] Gupta in his brief claims that Farmer and Rice's drive-by of the property on March 25 "invites speculation as to its purpose," since it was allegedly not a "business requirement." Perhaps, he alleges, they were checking out the suitability of the spot for the proposed AmSouth branch? However, Gupta fails to offer even a scintilla of evidence that Farmer knew anything whatsoever about AmSouth's own land acquisitions, or that those officers in charge of the acquisitions would have been the least bit influenced by Farmer's unsolicited opinion.

The Fifth Circuit, interpreting Texas law, states that "mere rumors, vague statements, and circumstances that are dubious or equivocal and do no more than arouse suspicion or create speculation, are not sufficient to constitute actual notice." E.D. Sys. Corp. v. S.W. Bell Tel. Co., 674 F.2d 453, 459 (5th Cir.1982) (emphasis added).
[7] Gupta's counsel tried but failed to nail down the date: "Q. When did you learn that Deposit Guaranty Bank and the tire store had purchased those two parcels? A. I learned a local bank and tire store purchased that piece of property."
[8] See discussion under Issue VI, below, about the speed of AmSouth's loan process.
[9] Presumably, a business concern that behaves "commercially unreasonably" often enough will reap the rewards of its unreasonableness without the intervention of the courts.

Gupta bolsters his citations with two opinions from other states' courts, both cited in Delta Chemicaland which both concern the same U.C.C. provision under review in that case. Apart from that, he cites no other cases for his new tort; nor does he claim that the U.C.C. sets any "commercial reasonableness" standard for loan processing.
[10] The intervening Monday appears to have been a legal holiday. The delay until June 26 was due to a court-ordered continuance which AmSouth opposed, citing as one reason that Gupta had just offered the revised Wingfield report.