IRVING, P.J.,
for the Court:
¶ 1. The Madison County Circuit Court granted summary judgment to Trustmark National Bank (Trustmark) against Joe E. Morgan Jr., J. Frank Pucylowski, Thomas M. Harkins, and Mark Doiron (collectively, the “Guarantors”) for the balance owed on a loan that was personally guaranteed by them. In the same summary judgment, the circuit court granted a judgment in favor of Trustmark on a counterclaim brought against it by Morgan. Feeling aggrieved, the Guarantors, except Doiron, appeal and argue that the circuit court erred in granting the summary judgment.
¶ 2. Finding that the grant of summary judgment was proper, we affirm.
FACTS
¶ 3. The Guarantors formed Old Fifty One LLC (Old 51) as a commercial real estate development company. In early 2007, the Guarantors identified a piece of property that they wanted to acquire and develop into a commercial shopping center. Harkins and Doiron emailed Carl Sand-berg, Trustmark’s Vice President of Residential Construction/Real Estate, to inquire about obtaining a land-purchase loan and a construction loan to purchase and develop the property. On March 8, 2007, Sandberg emailed Dorion and advised Doi-ron that he and Zach Nordan, another Trustmark loan officer, were considering presenting Old 51’s loan request to Trust-mark’s loan committee for approval. Sandberg’s email briefly addressed possible interest rates for the loans, a proposed loan-to-value ratio for the construction loan, and the requirement that the Guarantors fully guarantee the loan. Both Sandberg and Nordan testified in their depositions that they considered the email to be a preliminary term sheet.
¶ 4. Before preparing a construction-loan proposal, Nordan requested that the Guarantors provide him with an exact-cost breakdown for the proposed development, including exact square footage, tenant build-out, interest-carrying costs, and land pay-down costs. However, the Guarantors could not provide the information for the construction-loan proposal. Therefore, they decided to pursue a land-purchase loan instead of a construction loan.
¶ 5. Nordan prepared a Loan Presentation Memorandum (LPM) and presented Old 51 ⅛ loan proposal to Trustmark’s loan committee. On May 2, 2007, the loan committee approved the requested land-purchase loan for $2.3 million, but conditioned approval on a fifteen percent equity investment as collateral, an eighty-five percent loan-to-value ratio, a six-month loan term, *265 and a deed of trust on the property. Additionally, each guarantor would have to sign a guaranty agreement, with each guarantor taking personal responsibility for full repayment of the loan.
¶ 6. Nordan informed the Guarantors that the loan committee had approved the loan subject to the above conditions. The Guarantors agreed to the loan committee’s terms, executed a promissory note, and signed full guaranties. The Guarantors also submitted a $345,000 irrevocable letter of credit as Old 51’s equity investment. Trustmark’s loan representatives testified during their depositions that they expected Old 51 to request a construction loan at a later date when the Guarantors could provide the required documentation to Nor-dan for presentation to the loan committee.
¶ 7. Trustmark disbursed the land loan to Old 51 in June 2007, and Old 51 purchased the property. Nordan continued to work with the Guarantors to develop a construction-loan proposal to submit to Trustmark’s loan committee. Nordan requested that the Guarantors provide him with an itemization of construction costs and a copy of three signed leases from the development’s tenants. Trustmark repeatedly renewed the land-purchase loan in order to give the Guarantors more time to provide the requested information.
¶ 8. In May 2008, Nordan prepared a second LPM for Old 51. The 2008 LPM requested a construction loan for over four million dollars. Additionally, it provided that each guarantor would only be responsible for repaying up to fifty percent of the loan and offered a ten percent equity investment as collateral. On May 28, 2008, Trustmark’s loan committee approved the loan.[1] On June 6, 2008, Nordan issued a commitment letter to Old 51 and the Guarantors detailing the terms of the loan.
The Guarantors were required to sign and return the commitment letter by June 16, 2008. The letter also stated that the loan committee required that the project be pre-leased, with three one-year leases in place prior to the August 1, 2008 closing date. The Guarantors never signed the commitment letter, and it expired on June 16, 2008. Nevertheless, the Guarantors continued to tell Nordan that they intended to go forward with the project.
¶ 9. In April 2009, Harkins informed Nordan that Old 51 had decided to downscale the project. Harkins requested that Nordan propose a loan based on the downscaled project, which Nordan did. In the 2009 LPM, Old 51 requested a $950,000 construction loan. On April 30, 2009, the loan committee approved the construction loan, but requested updated, personal financial statements from Doiron and Morgan, an equity injection of $200,000, and cross-collateralization of the land and construction loans. Nordan began preparing a commitment letter, but before it was completed, Harkins informed him that the Guarantors would not sign a loan commitment because Old 51 had decided to sell the property.
¶ 10. The land loan matured on October 28, 2009. Shortly thereafter, Harkins requested a loan renewal in order to give Old 51 more time to sell the property. Although the loan was already in default at this time, Trustmark approved the renewal. However, it conditioned its approval on Harkins and Morgan submitting updated, personal financial statements. When Harkins and Morgan refused to provide Trustmark with the requested documentation, Trustmark denied the renewal request. On March 3, 2010, Trustmark filed suit against Old 51 and the Guarantors to *266 collect the balance on the defaulted land loan.[2] The Guarantors timely answered the complaint and alleged breach of contract, fraudulent inducement/misrepresentation, and breach of fiduciary duty as affirmative defenses. Additionally, Morgan filed a breach-of-contract counterclaim against Trustmark and asserted that he was a third-party beneficiary to a construction-loan contract between Old 51 and Trustmark. Trustmark filed a motion for summary judgment on both claims, which the circuit court granted.
¶ 11. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 12. Appellate courts review a circuit court’s decision to grant summary judgment de novo. Holland v. Peoples Bank & Trust Co., 3 So.3d 94, 98 (¶ 9) (Miss. 2008). “The evidence must be viewed in the light most favorable to the non-moving party and if, in this view, the moving party is entitled to a judgment as a matter of law, then summary judgment should be granted in his favor. Otherwise, the motion should be denied.” Id. at 98-99 (¶ 9) (citing Palmer v. Anderson Infirmary Benevolent Ass’n, 656 So.2d 790, 794 (Miss. 1995)). “The party seeking summary [judgment] bears the initial burden of demonstrating [that] there are no genuine issues of material fact to be decided by the trier of fact.” Commercial Bank v. Hearn, 923 So.2d 202, 204 (¶4) (Miss.2006) (citing M.R.C.P. 56).

1. Summary Judgment as to Trust-mark’s Claim

¶ 13. The Guarantors acknowledge that they each signed full guaranties insuring repayment of the land-purchase loan. They also acknowledge that Old 51 defaulted on the loan. Nevertheless, the Guarantors argue that the circuit court erred in granting summary judgment in favor of Trustmark. They specifically argue that Trustmark and Old 51 entered into a contract to make a land-purchase loan and a construction loan, which Trustmark breached by not making the construction loan. Additionally, the Guarantors assert that their defenses to repaying the loan demonstrate that there are genuine issues of material fact that preclude summary judgment.
¶ 14. Trustmark attached the following items to its motion for summary judgment: signed copies of the original promissory note and all renewals of the note, copies of the commercial guaranties signed by the Guarantors, Nordan’s affidavit detailing the loan’s remaining balance, and a printout of the amount due on the loan. In response to Trustmark’s motion, the Guarantors submitted an affidavit from Har-kins; a copy of the 2007 LPM; a copy of Sandberg’s email; a copy of the 2008 commitment letter (unsigned); and an affidavit from Timothy Martin, Harkins’s accountant, concerning submission of Harkins’s financial statements to Trustmark, a. Existence of a Contract
¶ 15. The Guarantors assert that Sand-berg’s email, when considered together with the 2007 LPM, created a binding contract between Trustmark and Old 51 to make both a land-purchase loan and a construction loan. We disagree. The Mississippi Supreme Court has long held that “an offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are *267 reasonably certain.” Beck v. Goodwin, 456 So.2d 758, 760 (Miss.1984) (citation omitted). Moreover, in order to have a contract based on multiple documents, the documents must be communicated between the parties. Hollister v. Frellsen, 148 Miss. 568, 574, 114 So. 385, 386 (1927).
¶ 16. It is undisputed that the Guarantors never saw the 2007 LPM prior to signing the promissory note or the commercial guaranties. Thus, it could not constitute an offer or be part of an offer from Trustmark. Additionally, Sandberg’s email was too indefinite in its terms to constitute a contract to lend money. The email failed to include essential terms sufficient to form a loan agreement, such as the principal amount of the loans, repayment terms, or collateral to secure the loans. Furthermore, Sandberg’s email made it clear that the terms that he listed in the email had to be presented to the loan committee for approval. The only promise made in Sandberg’s email was the promise to present the loan proposal to the loan committee for approval, which Nor-dan did. The Guarantors have failed to present sufficient evidence that Trustmark obligated itself to make a construction loan to Old 51. This argument is without merit.

b. Guarantors’Affirmative Defenses

¶ 17. The Guarantors argue that their affirmative defenses preclude summary judgment. Specifically, the Guarantors maintain that because they were fraudulently induced into signing the guaranty agreements and because Trustmark breached its fiduciary duties, they are not obligated to repay the loan. Our supreme court has reiterated that “it is fundamental that the burden of proof of affirmative defenses rests squarely on the shoulders of the one who expects to avoid liability by that defense.” Eekman v. Moore, 876 So.2d 975, 989 (¶47) (Miss.2004) (quoting Pearl Pub. Sch. Disk v. Groner, 784 So.2d 911, 916 (¶ 20) (Miss.2001)). Therefore, in order to defeat Trustmark’s summary-judgment motion, the Guarantors carried the burden to demonstrate that genuine issues of material fact remained concerning their affirmative defenses, which would defeat Trustmark’s claim. However, the Guarantors failed to meet that burden.
¶ 18. The Guarantors failed to show that they were fraudulently induced into signing the guaranty agreements. The only evidence that the Guarantors produced to demonstrate that they were fraudulently induced into signing the guaranty agreements was Sandberg’s email. As previously stated, Sandberg’s email was simply a preliminary term sheet upon which a loan could possibly be made, not a promise to loan money to Old 51.
¶ 19. Even if Sandberg’s email could be interpreted as a promise that Trustmark would make a construction loan to Old 51, that promise cannot form the basis of a fraudulent-misrepresentation claim. In Holland, our supreme court noted that the promise to lend money in the future will not support recovery under a fraudulent-misrepresentation claim. Holland, 3 So.3d at 99-100 (¶ 12). The Guarantors could only prevail on this claim with evidence that the “promise [was] made with the present undisclosed intention of not performing it.” Id. at 100 (¶ 12) (quoting Bank of Shaw v. Posey, 573 So.2d 1355, 1360 (Miss.1990)). However, the Guarantors failed to present such evidence. In fact, the 2008 LPM and the 2009 LPM show that Trustmark approved the requested loans, and it was the Guarantors’ actions that prevented the completion of the loan process.
¶ 20. Finally, the Guarantors presented no evidence of a fiduciary relationship with Trustmark. “A fiduciary relationship does not automatically exist in a *268 commercial loan transaction.” AmSouth Bank v. Gupta, 838 So.2d 205, 216 (¶ 32) (Miss.2002) (citations omitted). “The party asserting the existence of a fiduciary relationship bears the burden of proving its existence by clear and convincing evidence.” Id. (citing Smith v. Franklin Custodian Funds, Inc., 726 So.2d 144, 150 (¶ 28) (Miss.1998)). “[Courts] use a three-part test [when] determining whether a fiduciary relationship exists in a commercial transaction[.]” Id. The test calls for consideration of “whether: (1) the parties have shared goals in each other’s commercial activities, (2) one of the parties places justifiable confidence or trust in the other party’s fidelity, and (3) the trusted party exercises effective control over the other party.” Id. (citing Smith, 726 So.2d at 151 (¶ 28)). These factors must exist independently of those features common to every free-market transaction. See id. at (¶ 33).
¶ 21. The Guarantors contend that Trustmark’s actions and the relationship between Trustmark and the Guarantors demonstrate that a fiduciary relationship existed. In describing Trustmark’s actions, they point to things that are common to every loan-application transaction — mutual hope that the land-purchase loan would be repaid, trust in Trustmark’s handling of the loan, and the tender of collateral in exchange for the loan. If this were all that is required to create a fiduciary relationship in a commercial transaction, such “would effectively extend the mantle of the fiduciary relationship over every loan-application transaction.” Id.
¶ 22. Additionally, while the 2007 LPM revealed that Harkins and Pucylowski had commercial relationships with Trustmark prior to 2007, there is no evidence that those relationships exceed the bounds of the generally non-fiduciary debtor/creditor relationship. Furthermore, there is no evidence of any special dealings or arrangements with Trustmark that might otherwise suggest that a fiduciary relationship existed between the Guarantors and Trust-mark. As such, we find that there is no evidence of a genuine issue as to any material fact with respect to the existence of a fiduciary relationship between Trustmark and the Guarantors.
¶ 23. Consequently, the circuit court did not err in granting summary judgment in Trustmark’s favor, as the Guarantors failed to demonstrate that genuine issues of material fact exist as to whether Trust-mark fraudulently induced them into signing the guaranties or breached a fiduciary relationship. This issue is without merit.

2. Summary Judgment as to Morgan’s Counterclaim

¶ 24. Morgan additionally contends that the circuit court erred in granting summary judgment in favor of Trustmark on his breach-of-contract counterclaim. Morgan asserts that he is a third-party beneficiary to the contract between Trustmark and Old 51 that obligated Trustmark to the construction loan. However, as we have found that there was no contract between Trustmark and Old 51 for a construction loan, Morgan’s counterclaim must also fail. Accordingly, this issue is without merit.
¶ 25. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR.

. The terms of the approved loan contained additional conditions not included in the LPM. The additional conditions required the assignment of leases, rents, and profits.

. On April 27, 2010, Old 51 filed for bankruptcy. The circuit court stayed the action against Old 51 because of Old 51’s pending Chapter 7 bankruptcy petition.