GRIFFIS, P.J.,
for the Court:
¶ 1. After a portion of his property was taken by eminent domain, Clement B. Saucier Jr. filed suit against the sellers and mortgagor of the property. He argued that they breached the duty to disclose a known interest in an easement at the time of the sale. The trial court granted the defendants’ summary-judgment motions and found that no duty to disclose existed because the interest expressed in the easement was speculative. We reverse and remand for proceedings consistent with this opinion.
FACTS
¶ 2. This litigation arose as a result of the sale and purchase of approximately eighty acres of undeveloped land in Van-cleave, Mississippi. Saucier bought the property from Elizabeth Sekul, an eighty-year-old widow, and the Wallace Steve Se-kul Family Trust. Sekul and the Trust each owned one-half of the property. Se-kul was the sole beneficiary of the Trust.
¶ 3. In April 2006, approximately three months before the sale was completed, a representative of South Mississippi Electrical Power Association (“SMEPA”) sent two letters to Sekul that requested permission to survey the property. Sekul admitted that she received one of the two letters, but could not recall which one.
¶ 4. The first letter was dated April 11, 2006. It stated:
[SMEPA is] in the process of doing a preliminary survey to route a 69 KV transmission line in Jackson County to help improve the electric service in the area. In order to complete this survey we are asking your permission to do a preliminary survey across your property located in ... Jackson County, Mississippi. The survey will consist of the survey crew walking across the property establishing a centerline and outside boundaries. The right-of-way required will be 100 feet wide and will be acquired at market value in addition to market value for any timber which will need to be removed. The powerline will be constructed using single wooden poles or possibly concrete poles.
The second letter was dated April 27, 2006. It reads the same as the April 11 letter except the “69 KV transmission line” was changed to “a 115 KV transmission line.”
*722 It also indicated that a map was attached, with the survey area highlighted.
¶ 5. After Sekul received the letter, she met with her long-time friend Thomas J. Sliman at her apartment. At the time, Sliman was employed as the Senior Vice President and Chief Information Officer of The Peoples Bank, Biloxi, Mississippi (“Peoples Bank”). Sekul and Sliman discussed the SMEPA letter. During the discussion, Sekul told Sliman to “keep her in mind” if he knew of anyone interested in purchasing the land.
¶ 6. Within a couple of weeks, Sekul met with a SMEPA representative. Sekul asked Sliman to attend the meeting because she feared SMEPA might take advantage of her due to her age. The meeting was held at Peoples Bank.
¶ 7. During the meeting, the SMEPA representative offered to purchase the property for the right-of-way. Sekul responded: “I don’t want to sell it to the power company[;] please stay off my land.” According to Sliman, the SMEPA representative then told Sekul, “well, we can take it by eminent domain[,] and we want to do a survey.” Sekul responded: “[D]o what you have to, but I’m not willing to give you an easement.” SMEPA did not contact Sekul or Sliman again.
¶ 8. Shortly after the meeting with Se-kul and the SMEPA representative, Sli-man told Saucier of the land’s availability. Sliman was also Sáucier’s long-time banker and knew of Saucier’s interest in purchasing land for development.
¶ 9. Neither Sekul nor Sliman ever said anything to Saucier about SMEPA’s interest in obtaining a portion of the property for an easement. While inspecting the property prior to the closing, Saucier noticed survey ribbons on the property and asked Sliman if he knew what they were for. Sliman said he did not know, again saying nothing about SMEPA’s interest in conducting a survey for an easement.
¶ 10. Sliman was involved in the negotiation for the purchase. Sliman told Saucier that Sekul wanted $10,000 an acre for the property. Saucier informed Sliman that he would make a counter-offer of $8,000 an acre. Sekul testified, in her deposition, that she was unaware of Saucier’s counter-offer. Sliman then informed Saucier that Sekul insisted on $10,000 per acre.
¶ 11. Saucier ultimately agreed to purchase the property for the asking price of $10,000 per acre. The sales contract was prepared by a law firm used by both Saucier and Peoples Bank. Sliman reviewed the contract before having Saucier sign it. The contract was mailed to Sekul, at her home in Georgia. Sekul signed the contract and returned it. Saucier never dealt directly with Sekul or the Trust. Sliman also handled Saucier’s $800,000 loan with Peoples Bank that was used to purchase the property, The closing occurred on or about July 10, 2006, and Saucier paid a purchase price of $805,500 for the property-
¶ 12. Two years later, SMEPA contacted Saucier and informed him that a four- and-a-half-acre easement was needed to install power lines along the road running adjacent to the property. The SMEPA representative told Saucier that Sekul had granted them permission to survey the property. In May 2008, SMEPA submitted a written offer of $12,865 per acre to purchase 4.5 acres of the property. Saucier rejected the offer.
¶ 13. On July 9, 2008, SMEPA then filed an eminent-domain action in the County Court of Jackson County, Special Court of Eminent Domain. SMEPA was granted possession of the property in September 2008. Saucier moved the court to stay the award of damages. The eminent- *723 domain action is currently pending, awaiting the outcome of this litigation.
¶ 14. On October 31, 2008, Saucier commenced this action and filed his Complaint for Rescission and Damages in the Chancery Court of Jackson County, Mississippi. The complaint named Peoples Bank, the Trust, Sekul, and Sliman as defendants. The complaint identified the claims as breach of fiduciary relationship, breach of contract, failure to disclose a significant future title servitude, negligent misrepresentation, and fraud in the inducement. The complaint also asked that the court rescind the entire transaction and award damages to compensate Saucier for all expenses that arose from the purchase.
¶ 15. On February 17, 2009, Peoples Bank and Sliman filed a motion to strike the claims of rescission and to transfer the case to circuit court. By order dated June 3, 2009, the chancellor transferred this case to the Circuit Court of Jackson County, Mississippi.[1]
¶ 16. On August 31, 2011, Peoples Bank and Sliman filed a motion for summary judgment. On the same day, Sekul and the Trust filed a motion for summary judgment. Saucier also filed a motion for summary judgment. Peoples Bank and Sli-man also filed a motion to exclude the expert testimony of appraiser David Craft. Responses were filed to all of the motions, and the court heard argument on October 5, 2011.'
¶ 17. On October 25, 2011, the circuit court granted summary judgment in favor of all defendants and issued two separate opinions. One opinion dealt with the claims brought against Peoples Bank and Sliman, and the other opinion dealt with the claims brought against Sekul and the
Trust. The court declined to rule on the motion to exclude the expert testimony of Craft, as the issue was moot. The court then denied Saucier’s motion for reconsideration. It is from these judgments that Saucier now appeals.
STANDARD OF REVIEW
¶ 18. “We review the grant or denial of a motion for summary judgment de novo, viewing the evidence ‘in the light most favorable to the party against whom the motion has been made.’ ” Karpinsky v. Am. Nat’l Ins. Co., 109 So.3d 84, 88 (¶ 9) (Miss.2013) (citation and internal quotation marks omitted).
¶ 19. Under our de novo review, the summary-judgment standard is as follows:
[I]n a summary judgment hearing, the burden of producing evidence in support of, or in opposition to, the motion is a function of Mississippi rules regarding the burden of proof at trial on the issues in question. The movant bears the burden of persuading the trial judge that: (1) no genuine issue of material fact exists, and (2) on the basis of the facts established, he is entitled to [a] judgment as a matter of law. The movant bears the burden of production if, at trial, he would bear the burden of proof on the issue raised. In other words, the movant only bears the burden of production where [he] would bear the burden of proof at trial. Furthermore, summary judgment is appropriate when the non-moving party has failed to make a showing sufficient to establish the existence of an element essential to the party’s case, and on which that party will bear the burden of proof at trial.
Id. at 88-89 (¶ 11) (internal citations and quotation marks omitted). Summary *724 judgment “shall be rendered ... if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” M.R.C.P. 56(c).
ANALYSIS
¶ 20. For our review, we note that the complaint identified four separate claims. First, Saucier alleged that 'he was in a fiduciary relationship with Peoples Bank and Sliman, and they breached this fiduciary relationship. Second, Saucier alleged a breach of contract;, the contractual parties included Saucier, as the buyer, and Sekul and the Trust as the sellers. The breach-of-contract claim was against Sekul and the Trust. Next, Saucier alleged the claims of negligent misrepresentation and fraud against the “defendants,” which we interpret to be against all of the defendants. Sekul and the Trust were represented by counsel. Peoples Bank and Sliman were represented by separate counsel.

1. Claim Against Peoples Bank and Sliman for Breach of Fiduciary Duty

¶ 21. Saucier alleged a claim against Peoples Bank and Sliman for breach of fiduciary duty. Saucier claimed he was in a fiduciary relationship with Peoples Bank and Sliman. He argued that the failure to notify him of the SMEPA easement was a breach of this fiduciary relationship. Saucier asked the court to rescind the “entire transaction,” meaning the promissory note and deed of trust, and award damages for all expenses incurred as a result of the purchase.
¶22. Peoples Bank and Sliman asked for a summary judgment. They argued there was not a fiduciary relationship and there were no genuine issues of a material fact in dispute. They claimed they were entitled to a judgment as a matter of law. The circuit court agreed and held:
Specifically, Mr. Saucier claims the Bank and Mr. Sliman owed him a fiduciary duty to disclose the potential acquisition based on Mr. Saucier’s longstanding professional and personal relationship with both parties. Mr. Sliman was both Mrs. Sekul’s and Mr. Saucier’s banker and friend. Mrs. Sekul told Sli-man about the property in Jackson County she wanted to sell and asked him to keep her in mind if he became aware of any potential buyers. Coincidentally, Mr. Saucier asked Mr. Sliman if he knew of any Jackson County property for sale that he could purchase and resell for development. Mr. Sliman told Mr. Saucier of the acreage, purchase price, and the location and later conveyed Mr. Saucier’s interest to Mrs. Sekul. Both Mrs. Sekul and Mr. Saucier had attorneys draft the necessary documents, perform a title search, and conduct the closing. The Peoples Bank financed the $800,000 loan for Mr. Saucier’s purchase of the property.
The thrust of Mr. Saucier’s argument that Mr. Sliman and the Bank had a fiduciary duty centers entirely on his personal and professional relationship with them. The Bank, however, did not have any involvement further than financing the loan for the transaction. “As a matter of law,' a mortgagor-mortgagee relationship is usually not a fiduciary relationship.” Dominquez v. Palmer, 970 So.2d 737, 742 (Miss.Ct. App.2007) (citing Merchants & Planters Bank v. Williamson, 691 So.2d 398, 403 (Miss.1997)).
*725 Mr. Saucier must prove by clear and convincing evidence that he and Mr. Sli-man had a fiduciary relationship which would impose a duty to disclose. Am-South Bank v. Gupta, 838 So.2d 205, 216 (Miss.2002). Mr. Sliman acted only as the initial liaison between Mr. Saucier and Mrs. Sekul. He had no involvement in the real estate transaction other than as the Bank’s agent in obtaining financing for Mr. Saucier. The Court finds there was no fiduciary relationship between Peoples Bank, Sliman, and Saucier. Though Mr. Sliman was aware of the potential easement acquisition by SMEPA, he was under no duty to disclose it to Mr. Saucier.
(Emphasis added).
¶ 23. Determining the existence of a fiduciary relationship is a question of fact. Smith v. Franklin Custodian Funds, Inc., 726 So.2d 144, 150 (IT 28) (Miss.1998). Saucier bore the burden of proving the existence of a fiduciary duty by clear and convincing evidence. Gupta, 838 So.2d at 216 (¶ 32).
¶ 24. Saucier argues that Sliman and Peoples Bank owed him a fiduciary duty to disclose SMEPA’s interest in the easement. Saucier recognizes that “ordinarily a bank does not owe a fiduciary duty to its debtors and obligors .... ” Burgess v. BankPlus, 830 So.2d 1223, 1227 (¶8) (Miss.2002) (citation omitted). Although there is no presumption of a fiduciary relationship between a creditor and debtor, “it is possible for a debtor to prove the existence of a fiduciary relationship with its creditor.” Peoples Bank & Trust Co. v. Cermack, 658 So.2d 1352, 1358 (Miss.1995) (overruled on other grounds by Adams v. Homecrafters, Inc., 744 So.2d 736 (Miss.1999)). Saucier argues that his dealings with Peoples Bank over the past fifty years, and Sliman over the past twenty years, created such a duty.
¶ 25. In Lowery v. Guaranty Bank & Trust Co., 592 So.2d 79 (Miss.1991), the court summarized the law on fiduciary relationships as follows:
“Fiduciary relationship” is a very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one person trusts in or relies upon another. A fiduciary relationship may arise in a legal, moral, domestic, or personal context, where there appears on the one side an overmastering influence or, on the other, weakness, dependence, or trust, justifiably reposed. Additionally, a confidential relationship, which imposes a duty similar to a fiduciary relationship, may arise when one party justifiably imposes special trust and confidence in another, so that the first party relaxes the care • and vigilance that he would normally exercise in entering into a transaction with a stranger.
Id. at 83 (internal quotation marks and citations omitted).
¶26. To determine if a fiduciary relationship was created in a commercial transaction, we look to “whether (1) the parties have shared goals in each other’s commercial activities, (2) one of the parties places justifiable confidence or trust in the other party’s fidelity, and (3) the trusted party exercises effective control over the other party.” Gupta, 838 So.2d at 216 (¶ 32).
¶27. As to the first element— “shared goals in each other’s commercial activities” — Saucier argues that he presented sufficient evidence to establish this element, for the purpose of summary judgment. Saucier claims that Sliman, Peoples Bank, and he all sought to profit from the transaction. For instance, Saucier planned to resell the property for a profit, and Sliman and Peoples Bank wanted to *726 profit from the interest paid on Saucier’s loan. Saucier claims to have paid a significant sum of interest on this loan to date. Peoples Bank and Sliman respond that this does not prove “shared goals,” as the goal of profit “is a feature common to every free-market transaction.” Id. at (¶ 33).
¶28. Here, this was not the “arms-length” transaction that Peoples Bank and Sliman claim. Contrary to the circuit judge’s factual finding that “Sliman acted only as the initial liaison between Mr. Saucier and Mrs. Sekul [and] had no involvement in the real estate transaction other than as the Bank’s agent in obtaining financing for Mr. Saucier,” there was a genuine issue of a material fact as to Sliman’s involvement. Saucier has presented a genuine issue of a material fact to dispute the court’s finding, which could establish that Sliman was actively involved in the transaction. There are facts presented here that would establish that Sliman acted as an intermediary between the sellers (Sekul and the Trust) and the buyer (Saucier).
¶ 29. There are facts that show Saucier never dealt with Sekul or the Trust; instead, Sliman acted as the middleman in the negotiations over the sale price. Although Sliman was not compensated as the real estate agent, there are facts that would establish that he brokered the deal even though it was without compensation. Further, there are facts that also establish that Sliman either knew or should have known that the threat of the SMEPA easement was a factor that motivated Sekul to sell the property. For the purpose of summary judgment, we find that Saucier presented sufficient evidence to establish the first element.
¶ 30. As to the second element — “one of the parties places justifiable confidence or trust in the other party’s fidelity” — Saucier testified that he trusted Sliman and Peoples Bank due to their extensive past dealings. To support this relationship, Saucier testified that Sliman had previously given him investment advice, which he followed. Sliman, as an officer of Peoples Bank, assisted Saucier in obtaining eight to ten business loans with Peoples Bank. Sliman was also involved when Peoples Bank hired Saucier’s business, Saucier Brothers’ Roofing, to perform roofing jobs on buildings owned by Peoples Bank. Saucier had a business and personal relationship with Peoples Bank as well, as he had banked there for over fifty years. For the purpose of summary judgment, we find that Saucier presented sufficient evidence to establish the second element.
¶ 31. As to the third element — “the trusted party exercises effective control over the other party” — Saucier contends that Sliman and Peoples Bank handled all details of the transaction, from having an appraisal prepared to drafting the real estate sales contract. Saucier testified that every fact he knew about the property came from Sliman, and Sliman handled all of the steps necessary to complete the transaction. Sliman and Peoples Bank point out that Saucier did very little individual investigation prior to the purchase. He obtained no survey, no appraisal, and no environmental report. He claims that he relied on Sliman’s statement that the property was eighty acres in size and cost $10,000 an acre.
¶ 32. In Pope v. Freedom Mortgage Corp., 2010 WL 1980399 (S.D.Miss.2010), the plaintiffs were persuaded to purchase residential properties for investment purposes by an employee (Gregg) of a mortgage lender, who then arranged for financing through that lender. Id. at *1. After closing, severe problems developed with nonpayment from the tenants, repair issues, and city code violations. The purchasers sued, alleging the breach of a fidu *727 ciary duty, among other claims. Id. The lender and its employee argued that this mortgage situation did not create a fiduciary relationship. In denying the defendants’ motion for summary judgment, the court cited Lowery and noted:
In the present case, the history of the relationship is not nearly as significant as that reflected in Lowery. However, like Lowery, the conduct purportedly giving rise to the fiduciary relationship occurred outside the note. Many of the Popes’ complaints have to do with Gregg’s conduct regarding the investment rather than the act of lending funds. According to the Popes, Gregg “offered them the properties, negotiated the contracts, arranged inspections, set up financing and did all the paperwork to close the loan.” ... The Popes sug- ' gest that this conduct created at least a quasi-fiduciary relationship.... Although a close question, the Court concludes that a jury question exists on this point based on the current record.
[T]he Popes base their claimed trust not on the contract to lend money, but on Gregg’s activities in finding the property and shepherding the entire deal through [to] fruition.
Gregg wore many hats for the Popes, several of which were related to securing the investment property rather than the loan. As stated above, there is a genuine factual dispute as to whether Freedom is vicariously liable for Gregg’s conduct. Likewise, questions of fact exist as to whether the Popes justifiably relied on Gregg and whether his acts created a fiduciary relationship. Finally, assuming a fiduciary relationship, there is a question of fact as to whether any fiduciary duties were [b]reached. Accordingly, the fiduciary duty claim survives summary judgment.
Id. at *5 (citations omitted).
¶ 33. Here, the loan between Saucier and Peoples Bank does not alone prove the existence of a fiduciary relationship, since “one normally does not enter into a contract with another unless he trusts and has confidence in him_” Gupta, 838 So.2d at 216 (¶ 33). However, 'Sliman’s actions and involvement as the intermediary in the transaction do contribute to create a question of fact as to the existence of a fiduciary relationship.
¶34. Saucier also points out that when he notified Sliman of the easement, Sliman said: “Oh my gosh, I guess I should have — I made a mistake. I should have told /all about this.” When he told Peoples Bank’s president, Chevis Swet-man, about the easement, Swetman purportedly said: “Oh my goodness. Don’t worry about a thing. We’re going to take care of this for you.” According to Saucier, Swetman even told Saucier not to deal with SMEPA: “You don’t deal with them at all. They come through me.”
¶ 35. Sliman and People’s Bank assert that these statements should not be considered. They argue that these statements — two years after the transaction— could not have influenced Saucier’s decision to purchase the property. See In re Will & Testament of Boyles, 990 So.2d 230, 235-37 (¶¶ 18, 22, 30) (Miss.Ct.App.2008) (acts subsequent to execution of will irrelevant to establish confidential relationship at time will was made). These statements obviously did not cause Saucier to purchase the land. But, for the purpose of summary judgment, they are relevant to show the relationship between Saucier and Peoples Bank that existed over a number of years, both before and after the purchase. See Arete Partners, L.P. v. Gunnerman, 594 F.3d 390, 394 (5th Cir.2010) *728 (applying Texas law) (Under Texas’s law of fraud, which has the same elements as Mississippi’s law concerning fraud, “a party’s intent may be inferred [from] the party’s subsequent acts following the representation.”); Overturf v. Aero Ins. Agency, Inc., 686 F.2d 850, 355 n. 4 (5th Cir.1982) (applying Louisiana law) (In a suit to recover on an insurance policy, the court held that “subsequent acts” are “relevant to a determination as to whether [the insured’s] original misrepresentation ... was simply an oversight or a deliberate misstatement.”).
¶ 36. Saucier relies on Lowery, which recognized the existence of a genuine issue of material fact as to the plaintiffs fiduciary relationship vidth a bank based on their past dealings. Lowery, 592 So.2d at 85. In Lowery, the plaintiff and her husband established a relationship with a bank officer, who would “place[ ] notes on hold” when they were unable to come to the bank. Id. The plaintiff trusted that the extensions were made, although there was no formal documentation. Id. Because the plaintiff had relied on the bank in the past to extend the notes, she and her husband had become “less vigilant about the coverage of the credit life insurance.” Id. This created a genuine issue of material fact as to whether the bank was obligated to provide notice that the credit life insurance terminated when the notes matured. Id.
¶ 37. Sliman and Peoples Bank cite a number of cases to the effect that the normal bank-customer relationship does not create a fiduciary relationship. In each case, however, the relationship between bank and customer was less extensive than in this case. For example, in Cermack, 658 So.2d at 1359, the customer was unable to show that the bank exercised effective control over him because he renegotiated terms the bank wanted to offer, and he rejected several of the bank’s requests on how to run his business. In Hopewell Enterprises, Inc. v. Trustmark National Bank, 680 So.2d 812, 816-17 (Miss.1996), there was no proof of special trust beyond a borrower-lender agreement. Likewise, in Strong v. First Family Financial Services, Inc., 202 F.Supp.2d 536 (S.D.Miss.2002), the plaintiffs, who obtained loans from First Family, sued alleging that First Family fraudulently induced them to buy products such as credit and disability insurance, at inflated prices. Id. at 538. Although the plaintiffs claimed that they trusted their lender to obtain insurance for them at the best prices possible, the proof showed that the lender clearly informed them of the terms and that such insurance was not required as a condition of receiving their loans. Id. at 542-43. No fiduciary relationship was found to exist. Id.
¶ 38. As in Lowery, Saucier has presented evidence of a course of dealings going beyond the single-loan situation addressed in cases cited by Sliman and Peoples Bank. Saucier’s past dealings with Sliman and Peoples Bank, together with Sliman’s involvement in the transaction, are relevant to whether a fiduciary relationship existed. For purpose of summary judgment, we find that Saucier presented sufficient evidence to establish the third element.
¶ 39. On de novo review of the summary judgment, considering the evidence in the light most favorable to Saucier, we find that there is a genuine issue as to a material fact in dispute, and Sliman and Peoples Bank are not entitled to a judgment as a matter of law. We reverse the circuit court’s grant of summary judgment as to Saucier’s claim for breach of fiduciary duty against Sliman and Peoples Bank, and remand this case to the circuit court for further proceedings consistent with this opinion.

*729
2. Claim Against Peoples Bank and Sliman for Breach of Duty of Fairness

¶ 40. Saucier also makes the argument that, even if there is no fiduciary relationship, Sliman and Peoples Bank owed him a duty of “fairness.” Because we have reversed the circuit court’s summary judgment on the claim for breach of fiduciary duty against Sliman and Peoples Bank, we see no reason to address this alternative argument made by Saucier.
¶41. We do note, however, that the duty of fairness is recognized even when a fiduciary duty does not exist. In First American National Bank of Iuka v. Mitchell, 359 So.2d 1376, 1377-78 (Miss.1978), overruled on other grounds by C & C Trucking Co. v. Smith, 612 So.2d 1092 (Miss.1992), a bank officer altered the due date of a note and “was using the threat of foreclosure to pressure mortgagors to sell their property for below market value to a purchaser whom he had chosen.” The court held that the bank “at least owed its mortgagors ... a duty of fairness which it violated.” Id. at 1380.
¶42. In Gupta, the court noted that even absent a fiduciary relationship, “in the mortgagor-mortgagee relationship, a degree of trust or a duty of fairness owed by one party to another carries with it a duty to disclose facts peculiarly within one party’s knowledge when failure to disclose may result in harm to the other party.” Gupta, 838 So.2d at 217-18 (¶ 41). There, while the plaintiffs loan application to purchase property was pending with the bank, the real-estate-acquisitions branch of the bank purchased a portion of the property. Id. at 210-11 (¶¶ 5-10). Because the acquisitions department was separate from the loan department and because the bank’s purchase was made only a couple of days after the plaintiff first approached the bank concerning his loan, the court found that there was no knowledge of the plaintiffs plan and no violation of a duty by the bank. Id. at 215-16 (¶¶ 29-30). Our supreme court thus declined to find a breach of the duty of fairness based on the rationale in Mitchell. Id. at 218 (¶¶ 41-42).
¶ 43. As a result, the claim for breach of the duty of fairness may be considered * on remand.

3. Claim Against Sekul and the Trust for Breach of Contract

¶ 44. Saucier also claimed that Se-kul and the Trust breached the real estate sales contract. He argues that Sekul failed to provide him with the letter from SMEPA, and this was a breach of the provision that required disclosure of all documents in their possession or control.
¶ 45. The circuit court held:
The remaining claim of breach of contract is also without merit. The contract required Mrs. Sekul to provide and make available to Mr. Saucier[] “any and all documents pertaining to the Property which are in Seller’s actual possession or control, including but not limited to surveys, appraisals, engineering drawings, plats and environmental reports.” Mrs. Sekul admitted to having received one of the two letters requesting permission to perform a preliminary survey but not actually possessing it at the time of the contract. Mr. Saucier has not presented evidence to refute this contention. [“]A party opposed to a motion for summary judg- ' ment[ ] must bring forward ‘significant ' probative evidence’ demonstrating the existence of a triable issue of fact.” Stuckey v. The Provident Bank, 912 So.2d 859, 865 (Miss.2005) (citing Union Planters National Leasing, Inc. v. *730 Woods, 687 F.2d 117, 119 (5th Cir. 1982)).
¶46. The parties agree that the real estate sales contract was a valid and binding contract. The circuit court accurately characterized paragraph 11, titled “Seller’s Documents,” from the contract. However, the circuit court determined that Saucier failed to present a genuine issue of material facts that would dispute whether Sekul had “actual possession” of the SMEPA “survey ... engineering drawing or plats
¶ 47. Saucier claims that a genuine issue of a material fact is in dispute as to this issue. Sliman testified that Sekul had one of the SMEPA letters in her possession when he met with her at her apartment prior to the meeting with SMEPA. This was several weeks before she signed the real estate sales contract. Also, the April 27, 2006 letter specifically referenced an attached map showing the intended placement of the transmission lines. SMEPA provided a letter to Saucier that stated:
I enjoyed meeting with you and your family last week, and I hope to see you again. As we discussed, the previous property owner of record verbally allowed my company survey permission for a preliminary routing of this new overhead, electric transmission line.
At your request, a copy of the correspondence that we mailed to the previous owner, including a preliminary route drawn on an aerial photo, is enclosed for you to have for your records. My supervisor Larry E. Griffin and I also met with Mrs. Sekul and her friend Mr. Sli-man to discuss the preliminary survey.
¶ 48. The question is whether Sekul had actual possession of the SMEPA letter on May 24, 2006, when she signed the real estate sales contract. In her deposition, Sekul was not asked if she had the letter when she signed the contract. However, she was asked if she remembered being contacted by SMEPA, and she replied:
No, I don’t. I know I got one letter. I didn’t get two. They said I got two. I got one letter, but I was moving back and — between Ocean Springs, and it was after the hurricane, and everything was upset. So it could have been lost, but I received one letter.
It is unclear whether Sekul’s statement— “it could have been lost” — refers to the letter she claimed not to have received or the letter she admitted that she did receive. Regardless, Sekul’s answer does not establish that she did not possess a letter from SMEPA, which would have béen required to be provided to Saucier under paragraph 11, when she signed the real estate sales contract.
¶ 49. We find that there was a genuine issue of a material fact in dispute as to this issue. The April 27, 2006 letter and the correspondence provided by SMEPA both indicate that a map, which would suffice as a “survey ... drawing or plat,” was sent to Sekul identifying the preliminary route. Sekul did not provide the letter or the map or any other documents she may have had in her possession, and her failure to do so would have been a breach of the real estate sales contract that may have allowed Saucier to rescind the contract or receive damages.
¶ 50. Accordingly, we find the circuit court was in error to grant summary judgment as to the breach-of-contract claim Saucier asserted against Sekul and the Trust. We reverse the summary judg- ■ ment that dismissed the breach-of-contract claim and remand this matter for further proceedings consistent with this opinion.

k- Claims Against All Defendants for Negligent Misrepresentation

¶ 51. .Saucier’s complaint asserted separate claims for negligent misrepresentation *731 against the defendants. Saucier argues that the defendants’ knowledge of and failure to inform him of SMEPA’s interest in the easement was a negligent misrepresentation. He claims that it was error to dismiss this claim on summary judgment.
¶ 52. The elements of negligent misrepresentation are:
(1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person/entity charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons/entities; (4) that the plaintiff reasonably relied upon the misrepresentation or omission; and (5) that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.
Hazlehurst Lumber Co. v. Miss. Forestry Comm’n, 983 So.2d 309, 313 (¶ 11) (Miss.2008) (quoting Horace Mann Life Ins. Co. v. Nunaley, 960 So.2d 455, 461 (¶ 20) (Miss.2007)). These elements must be proven by a preponderance of the evidence. Holland v. Peoples Bank & Trust Co., 3 So.3d 94, 101 (¶15) (Miss.2008).
¶ 53. The circuit court determined that Saucier’s negligent-misrepresentation claims could not survive summary judgment. The court held that Saucier cannot establish the first element (a misrepresentation or omission of a fact) and the fifth element (suffered damages) of the claim. As a result, our analysis will consider these elements.
¶ 54. Although the circuit court entered two separate orders granting summary judgment, they were, in substance, identical. In both orders, the circuit court addressed the negligent-misrepresentation claim as follows:
Mr. Saucier has a difficult time in overcoming the first element. Because SMEPA’s acquisition was merely an abstract speculative interest at that point rather than an actual fact, Mrs. Sekul had nothing to disclose. Additionally, Mr. Saucier cannot prove damages. There has been no showing that SME-PA’s dormant interest in the property at the time Mr. Saucier acquired it caused any damages. Though Mr. Saucier claims the easement will affect his ability to re-sell it for development, these claims, like SMEPA’s interest at the time of his purchase, are speculative. “The requisite proof for determining damages is that, ‘they may be recovered only where and to the extent that the evidence removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty.’ ” Boone v. Hercules, 872 So.2d 730, 732 (Miss.Ct.App.2004) (quoting Sentinel Industrial Contracting Corp. v. Kimmins, 743 So.2d 954, 966-67 (Miss.1999)).
¶ 55. The difference between the two orders was that in the order that granted summary judgment to Sliman and Peoples Bank, the court considered the brea.ch-of-fiduciary-duty claim and declared: “Though Mr. Sliman was aware of the potential easement acquisition by SMEPA, he was under no duty to disclose it to Mr. Saucier.” Since we have previously found the circuit court was in error to grant summary judgment on the breach-of-fiduciary-duty claim, it follows that for the purpose of summary judgment, Sliman and Peoples Bank may have had a duty to disclose the easement. This requires that we consider the negligent-misrepresentation claim and the fraud claims against Sliman-and Peoples Bank in a fashion similar to that of Sekul and the Trust.
¶ 56. First, we address the circuit court’s finding that “SMEPA’s acquisition *732 was merely an abstract^] speculative interest” at the time the property was sold to Saucier. In Bank of Shaw v. Posey, 573 So.2d 1355, 1360 (Miss.1990), the court held that “the first element of the tort of negligent misrepresentation must involve a representation concerning a past or present fact.” (Emphasis in original).
¶ 57. Saucier argues that the “fact” in question here is not SMEPA’s ultimate acquisition of an easement; rather, it was the letters they sent to Sekul and meeting with her and Sliman that expressed not only their request to purchase the property but their intention to obtain the property through eminent domain. Saucier claims that the letters and meeting with SMEPA were past facts that would have been material to his decision to purchase the property.
¶ 58. There was evidence that Sekul had received the letters, and both Sekul and Sliman were aware of the letters and SMEPA’s intent to acquire a portion of the property. Sekul told SMEPA to “stay off [her] land,” and SMEPA did not contact her again. Sekul stated that she did not disclose the request for a survey to Saucier because she “just forgot about it. [She] thought it was over.” Sliman also claimed that “[a]fter the meeting, I forgot all about it.”
¶ 59. Sekul was upset and concerned enough about SMEPA’s letter to her to request a meeting with Sliman at her apartment to discuss it. Before Sliman left the meeting, Sekul told him that she wanted to sell the property and to keep her in mind if he learned of any potential buyers.
¶ 60. Thereafter, she asked Sliman to be present when she met with the SMEPA representative. Sliman even agreed to conduct the meeting at his bank. In fact, the meeting apparently ended with Sekul’s adamant rejection of SMEPA’s request and its representative declaring that SME-PA would either buy the easement or get it through eminent domain.
¶ 61. About two weeks later, Sliman told Saucier about the availability of the property. In all, no more than six weeks elapsed between the first letter SMEPA sent to Sekul (April 11, 2006) and the signed contract to purchase the land (May 24, 2006). In this short time span, Sekul and Sliman claim to have forgotten the very fact that appears to have been the impetus for the sale.
¶ 62. We disagree with the circuit court’s finding that “SMEPA’s acquisition was merely an abstract^] speculative interest at that point rather than an actual fact[;] Mrs. Sekul had nothing to disclose.” We find that there was a genuine issue of a material fact in dispute as to the first element of the claim for negligent misrepresentation against Sekul, that is, whether she made a misrepresentation or omission of a fact.
¶ 63. Next, we consider the circuit court’s finding that “Saucier cannot prove damages.” The fifth element for negligent misrepresentation requires “that the plaintiff suffered damages as a direct and proximate result of such reasonable reliance.” The question for us to decide is whether there is a genuine issue as to a material fact in dispute.
¶ 64. The circuit court’s ruling was cer-táinly tied to the SMEPA eminent-domain action against Saucier. Indeed, the eminent-domain action would require SMEPA to pay the landowner the fair market value for the property taken and the diminution in the value of the remainder. The circuit court found the damage award to be speculative because of the pending eminent-domain proceedings. The circuit court cited Mississippi State Highway Commission v. Franklin County Timber Co., 488 *733 So.2d 782 (Miss.1986), which held that the landowner, in an eminent-domain proceeding, is entitled to fair and just compensation, including damages “which the residue of the property suffers, including a diminution in the value of the remainder.” Id. at 785 (citation omitted). The circuit court was correct in finding the award was speculative, but this is not the proper consideration for this claim.
¶ 65. Instead, to review the fifth element of negligent misrepresentation, we must consider the remedy requested in this litigation. Saucier’s complaint did not seek to recover from Sekul and the Trust the value of the property taken or the diminution in value to the remainder of the property. Instead, the complaint sought rescission of the real estate sales contract.
¶ 66. The complaint asked for the recovery of “all expenses and damages incurred as a result of the purchase and as a result of this litigation, including purchase money, interest, appraisals, surveys, attorney fees, court costs, expert witness fees, and any incidental damages, as well as punitive damages.” The complaint did not ask for damages that the circuit court found Saucier could not prove.
¶ 67. Saucier stated that he would not have purchased the land had he known of the potential easement, since it would likely affect his ability to resell the property for development. Saucier offered evidence from an appraiser, David Craft. Craft testified as an expert witness that SME-PA’s interest in an easement should have been disclosed, prior to the sale, for consideration in the appraisal. Craft also testified that he would have needed more information, such as a statement in writing from SMEPA, before he could decide whether the property’s value was affected.
¶ 68. Allen Purvis, who appraised the land at the time of the purchase, testified that only “actual” or “confirmed” interests affect a property’s appraised value, while “possible or speculative” interests are not considered. After reviewing the second letter sent by SMEPA, Purvis stated: “It’s not specific enough to say the subject property will be part of the take.”
¶ 69. Saucier’s complaint essentially sought to substitute Sekul and the Trust in the eminent-domain proceeds and allow them to receive the compensation from that proceeding. Unfortunately, the circuit court did not consider rescission of the real estate contract or the damages alleged in the complaint. We find that there was a genuine issue of a material fact in dispute as to the negligent-misrepresentation claim against the defendants, and a summary judgment was not appropriate. We reverse the summary judgment as to the negligent-misrepresentation claim, and we remand this case to the court for further proceedings consistent with this opinion.

5. Claims Against All Defendants for Fraud or Intentional Misrepresentation

¶ 70. Saucier’s complaint asserted separate claims for fraud or intentional misrepresentation against the defendants. Saucier argues that the defendants’ knowledge of and failure to inform him of SME-PA’s interest in the easement was an intentional misrepresentation. He claims that it was error to dismiss this claim on summary judgment.
¶ 71. The elements of fraud or intentional misrepresentation are:
(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker’s knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer’s ignorance of its falsity, (7) his reliance on its *734 truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.
Virginia Coll, LLC v. Blackmon, 109 So.3d 1050, 1054-55 (¶ 15) (Miss.2013). Fraud must be proven by clear and convincing evidence, which is a higher burden of proof than required for negligent misrepresentation. Bank of Shaw, 573 So.2d at 1362. The burden of proof is higher because “[t]he basis for damages resulting from negligent misrepresentation is lack of care; the basis for damages from fraud is the want of honesty.” Id. at 1360 (emphasis added and citations omitted).- ¶ 72. In the order granting summary judgment to Sekul and the Trust, the circuit court addressed the intentional-misrepresentation claim as follows:
No evidence has been presented to implicate the Trust in this action other than its ownership of the property. The Sauciers cannot show any misrepresentation or fraud perpetrated by the Trust nor can they argue the Trust owed any duty to them. There are no genuine issues of material fact pertaining to the Trust and [a] judgment as a matter of law is appropriate.
Mr. Saucier’s claim of fraud is based on Mrs. Sekul’s alleged omission of fact regarding the potential easement by SMEPA. For silence to constitute fraud, a fiduciary relationship must exist between the parties. Poe v. Summers, 11 So.3d 129, 134 (Miss.Ct.App.2009). The Mississippi Supreme Court uses a 3-prong test to determine the existence of a fiduciary relationship in a commercial transaction: “whether 1) the parties have shared goals in each other’s commercial activities, 2) one of the parties places justifiable confidence or trust in the other party’s fidelity, and 3) the trusted party exercises effective control over the other party.” AmSouth Bank v. Gupta, 838 So.2d 205, 216 (Miss.2002) (citing Smith v. Franklin Custodian Funds, Inc., 726 So.2d 144, 151 (Miss. 1998)). Using this 3-step process with the clear and convincing standard in mind, there is no evidence before the Court to establish a fiduciary relationship between Mr. Saucier and Mrs. Se-kul. Since there was no such relationship between the parties, Mrs. Sekul’s alleged omission of fact does not constitute fraud.
¶ 73. Saucier argues that Sekul and Sliman deliberately withheld “relevant, significante,] and material” information pertaining “to the use and value of the [property.” Saucier argues that every party to a business transaction owes the duty to disclose material information.
¶74. In Holman v. Wilson Chrysler Jeep, Inc., 972 So.2d 564, 569 (¶ 9) (Miss. 2008), purchasers of a Jeep sued thé car dealership that sold it to them for fraud because the dealership did not disclose that the Jeep had been wrecked. On appeal following the grant of summary judgment for the dealership, our supreme court noted that “[t]he duty to disclose is based upon a theory of fraud that recognizes that the failure of a party to a business transaction to speak may amount to the suppression of a material fact which should have been disclosed and is, in effect, fraud.” Id. at 568 (¶ 9) (citation omitted). The court held:
One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is eonsummated[:]
... matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and ... the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns *735 that the other is about to act in reliance upon it in a transaction with him; and ... facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.
Id. at 568-69 (¶ 9) (citing Restatement (Second) of Torts § 551 (1977)). In reversing the grant of summary judgment, the court held that “[tjhere is enough evidence in the record to find a genuine issue of material fact exists whether Howard Wilson owed the Holmans a duty to disclose the damage prior to the consummation of the sale of the Jeep.” Id. at 569 (¶10).
¶ 75. In Green Realty Management Corp. v. Mississippi Transportation Commission, 4 So.3d 347 (Miss.2009), the supreme court reversed a summary judgment ruling that favored the Transportation Commission. The court held that the Commission had a duty to disclose its future plans on property it purchased where those future actions may have harmed the seller. Id. at 350 (¶¶ 6-7). Citing Holman and section 551 of the Restatement (Second) of Torts, the court held that whether the Commission’s silence fraudulently induced the sale was a jury question. Id.
¶ 76. Accordingly, we find that there is a genuine issue of a material fact in dispute as to whether Sekul or Sliman simply “forgot” that SMEPA had approached Se-kul seeking an easement or whether they intentionally withheld this information because they wanted the sale and financing to go through. We reverse the summary judgment as to the fraud or intentional-misrepresentation claim, and we remand this case to the circuit court for further proceedings consistent with this opinion.
¶ 77. THE JUDGMENT OF THE JACKSON COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEES.
LEE, C.J., ISHEE, ROBERTS, MAXWELL, FAIR AND JAMES, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., AND BARNES, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. The chancellor did not dismiss the rescission claim. Instead, the chancellor determined that the complaint asserted both equitable and legal claims, but would best be tried in circuit court. This order is not challenged in this appeal.