# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00274-COA

**GLENN BRIGHT HARRISON**                                                          **APPELLANT**

**v.**

**KIM DEANNE HOLLOWAY HARRISON**                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/08/2022 |
| TRIAL JUDGE: | HON. BILLIE J. GRAHAM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | TERRY L. CAVES RISHER GRANTHAM CAVES |
| ATTORNEY FOR APPELLEE: | RENEE M. PORTER |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 10/03/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McCARTY AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Kim Harrison filed a complaint for a divorce from Glenn Harrison on the ground of adultery. After Kim filed for divorce, she and Glenn entered into a property settlement agreement (PSA) dividing their personal and real property. Glenn also signed a waiver of process. Kim filed these documents in the Jones County Chancery Court.

¶2.     Glenn filed a motion to set aside the PSA and waiver of process. After a hearing, the chancellor granted Kim a divorce on the ground of adultery and denied Glenn's motion to set aside the PSA and waiver of process. Glenn now appeals, arguing that the parties intended to obtain an irreconcilable-differences divorce. Glenn also asserts numerous assignments of error relating to the parties' PSA.

¶3.     Finding no error, we affirm the chancellor's judgment granting Kim a divorce on the ground of uncondoned adultery and the chancellor's denial of Glenn's motion to set aside the PSA and waiver of process.

**FACTS**

¶4.     Glenn and Kim were married in March 1985, and the parties separated in May 2020. The marriage produced three children, all of whom were adults at the time of the parties' separation. On May 26, 2020, Kim filed a complaint for divorce on the grounds of adultery and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Kim's attorney drafted a PSA and waiver of process, and Glenn signed these documents on May 29, 2020. Kim filed the PSA and waiver of process in the chancery court on May 31, 2020.

¶5.     The next day, Glenn obtained counsel and filed a motion to set aside the PSA and waiver of process. In his motion, Glenn asserted that when Kim presented him with the PSA, she "concealed and misrepresented material facts concerning the parties' marriage, property, and debts." Glenn submitted that as a result, he signed the PSA and waiver of process based upon Kim's "undue influence, misrepresentation, fraud, concealment, duress, and undue methods." Glenn also filed an answer and counterclaim for divorce on the grounds of uncondoned adultery, habitual cruel and inhuman treatment, or, alternatively, irreconcilable differences.

¶6.     The chancellor held a hearing on Glenn's motion to set aside the PSA and waiver of

2

process. After the hearing, the chancellor entered an order denying Glenn's motion and enforcing the PSA as written. The chancellor explained that after hearing the testimony and reviewing the evidence, she did not find that Kim "concealed or misrepresented material facts concerning the parties' marriage, property[,] and debts."[1] The chancellor further found that Glenn did not sign the PSA and waiver as a result of any "undue influence, misrepresentation, fraud, concealment, duress and undue methods" by Kim.

¶7.     The chancellor held a separate hearing on Kim's complaint for divorce. After the hearing, the chancellor entered a final judgment granting Kim a divorce on the ground of uncondoned adultery. The chancellor incorporated the parties' PSA as part of the final judgment of divorce.

¶8.     Glenn now appeals.

## STANDARD OF REVIEW

¶9.     "This Court will not disturb a chancellor's judgment when it is supported by substantial credible evidence unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Doe v. Doe*, 341 So. 3d 953, 963 (¶22) (Miss. Ct. App. 2021).

## DISCUSSION

¶10.    Glenn asserts seven assignments of error attacking the chancellor's judgment granting

---

[1] Glenn and Kim have no minor children, so there were no custody or child support issues.

Kim a divorce on the ground of uncondoned adultery and the chancellor's order denying Glenn's motion to set aside the PSA and waiver of process. For purposes of clarity in discussion, we have combined several of these issues.

### I.       Judgment of Divorce

¶11.    Glenn asserts that he and Kim intended to obtain an irreconcilable-differences divorce, rather than a fault-based divorce. Glenn accordingly argues that the chancellor erred by granting Kim a divorce on the ground of uncondoned adultery.

¶12.    Our review of Kim's complaint for divorce shows that she filed for divorce on the grounds of adultery and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. After a hearing, the chancellor granted Kim a divorce based on uncondoned adultery. "In Mississippi[,] one seeking a divorce on the grounds of adulterous activity must show by clear and convincing evidence both an adulterous inclination of the offending party and a reasonable opportunity to satisfy that inclination." *Doe*, 341 So. 3d at 964 (¶26). "Adultery may be shown by evidence or admissions, and either is sufficient to support a decree of divorce." *Id*. When reviewing a chancellor's findings of fact concerning adultery, we will not set aside those findings "unless they are manifestly wrong." *Id*. As stated, we will uphold a chancellor's ruling "if it is supported by the credible evidence." *Id*. at 963 (¶22).

¶13.    At the hearing on Kim's complaint for divorce, Glenn's attorney announced that Glenn admitted to committing adultery and stated that Glenn was not contesting that ground

4

for divorce: "[T]he only issue left is the grounds for divorce. And [Kim] filed a complaint on the ground of adultery. [Glenn] has already admitted adultery, and we're not contesting the ground on that basis. So [Kim] is going to proceed on her ground of adultery, and we're admitting it." The parties and the chancellor then acknowledged that at various times during the divorce proceedings, Glenn had admitted to committing adultery. The chancellor accordingly entered a final judgment awarding Kim a divorce on the ground of uncondoned adultery.

¶14. We find that Glenn's admission to the chancellor that he committed adultery is sufficient evidence to support the chancellor's grant of a divorce to Kim on the ground of uncondoned adultery. We also find nothing in the record to support Glenn's assertion that both parties consented to a divorce based upon irreconcilable differences. *See* Miss. Code Ann. § 93-5-2(1) (Rev. 2021) (setting forth the statutory requirements necessary to obtain an irreconcilable-differences divorce); *see also Perkins v. Perkins*, 787 So. 2d 1256, 1263 (¶21) (Miss. 2001) (The "cornerstone" of an irreconcilable-differences divorce is "mutual consent."). The record reflects that Glenn filed a counterclaim for divorce and alleged fault-based grounds or, in the alternative, irreconcilable differences. We find nothing in the record to show that Kim or Glenn complied with section 93-5-2(5) and formally withdrew or canceled their competing fault-based grounds or that the parties filed a mutual-consent agreement pursuant to subsection (3). *See O'Neal v. O'Neal*, 17 So. 3d 572, 577 (¶24) (Miss. 2009) (explaining that "the filing of the mutual-consent agreement detailed in subsection (3)

5

of [s]ection 93-5-2 operates as a cancellation and withdrawal of the contests or denials referenced in subsection (5)"). In fact, in his appellate brief, Glenn admits that the parties did not consent to an irreconcilable-differences divorce: "[B]oth parties withdrew their consent to an irreconcilable differences divorce by taking action inconsistent with it—by Kim filing a fault-based complaint for divorce and by Glenn filing a motion to set the PSA aside."

¶15. Glenn also argues that the parties' PSA reflects that he and Kim intended to obtain an irreconcilable-differences divorce. Glenn cites the following language in the PSA: "If either party stops or unduly delays the timely dissolution of the marriage on the ground of irreconcilable differences, the other party shall have the right and option to rescind this Agreement, or, in the alternative, to seek strict enforcement of same." Glenn asserts that "irreconcilable differences" is the only ground directly linked to the "dissolution of the marriage" in the PSA. However, the PSA also contains the following statement: "By execution of this Agreement, Glenn admits that Kim has grounds for divorce due to his uncondoned adultery."

¶16. After our review, we find that while the PSA contains language contemplating an irreconcilable-differences divorce, the PSA in its entirety does not reflect that the parties actually intended to obtain an irreconcilable-differences divorce. *See* Miss. Code Ann. § 93-5-2 (setting forth the statutory requirements necessary for obtaining an irreconcilable-differences divorce). We therefore find that the chancellor did not err by granting Kim a divorce on the grounds of uncondoned adultery.

6

## II.     Property Settlement Agreement

¶17.    Glenn next argues that the chancellor erred by failing to set aside the PSA. As stated, Glenn claims that the parties intended to obtain an irreconcilable-differences divorce. Glenn maintains that because both parties eventually withdrew consent to an irreconcilable-differences divorce, the chancellor erred by still imposing the PSA upon the parties.

¶18.    We recognize that "a property settlement agreement executed in contemplation of a divorce based upon irreconcilable differences is unenforceable when one party withdraws from the irreconcilable differences proceeding and seeks a divorce on grounds other than irreconcilable differences." *Grier v. Grier*, 616 So. 2d 337, 341 (Miss. 1993). However, as stated, the record is clear that Glenn and Kim never consented to an irreconcilable-differences divorce. Additionally, the Mississippi Supreme Court has held that property settlement agreements are not exclusive to irreconcilable-differences divorces. *Id*. To avoid confusion in a divorce, the supreme court has instructed that a property settlement agreement "should specify, with particularity, within its four corners, whether it is to be limited to an irreconcilable differences divorce or whether it is intended to be binding in a divorce granted on any other grounds." *Id*. In the case before us, clause four of the parties' PSA provides as follows: "By execution of this Agreement, Glenn admits that Kim has grounds for divorce due to his uncondoned adultery." We therefore find no merit to Glenn's argument that because the parties did not consent to an irreconcilable-differences divorce,

7

the chancellor erred by imposing the PSA upon Glenn and Kim.

### A. Overreaching, Duress, Fraud, Misrepresentation, Unconscionability, and Undue Influence

¶19. Glenn also maintains that the PSA is inequitable because it gives Kim "everything except half of Glenn's retirement account." Glenn argues that the evidence shows he signed the inequitable PSA as a result of Kim's overreaching, duress, fraud, misrepresentation, and undue influence,[2] and therefore the PSA should be set aside as unconscionable. Glenn submits that the chancellor accordingly erred by failing to set aside the PSA.

¶20. In support of his argument, Glenn claims that when Kim confronted him about his affair and told him she wanted a divorce, she failed to disclose her own extramarital affairs. Glenn further asserts that Kim made misrepresentations to persuade him to sign the PSA, namely, that he would not be allowed to see his grandchildren unless he signed the papers. Glenn accuses Kim of ambushing him by not allowing him an opportunity to consult an attorney prior to signing the papers and by not letting him have any input on how the marital property was divided. He claims that no one explained the terms of the PSA and waiver of process to him before he signed them. Glenn also claims that at the time he signed the papers, he was suicidal and had been awake for two days straight.

---

[2] In his appellate brief, Glenn failed to provide any argument or cite any relevant authority as to his claim that the PSA was the result of undue influence. "The law is well established that points not argued in the brief on appeal are abandoned and waived." *Arrington v. State*, 267 So. 3d 753, 756 (¶8) (Miss. 2019). We further recognize that "[f]ailure to cite relevant authority obviates the appellate court's obligation to review such issues." *Id*. at (¶9); *accord* M.R.A.P. 25(a)(7).

¶21.    We recognize that "a property-settlement agreement is a binding contract between the parties." *Wilson v. Wilson*, 53 So. 3d 865, 869 (¶13) (Miss. Ct. App. 2011). The supreme court has explained that a "property settlement agreement is no different from any other contract, and the mere fact that it is between a divorcing husband and wife, and incorporated in a divorce decree, does not change its character." *East v. East*, 493 So. 2d 927, 931-32 (Miss. 1986). "Ordinarily, we will enforce such agreements absent any fraud, mistake, or overreaching." *In re Dissolution of Marriage of De St. Germain*, 977 So. 2d 412, 418 (¶20) (Miss. Ct. App. 2008). "[P]rovisions in contracts contrary to public policy or where obtained by overreaching[,] duress[,] or undue influence are unenforceable." *First Nat'l Bank of Vicksburg v. Caruthers*, 443 So. 2d 861, 864 n.3 (Miss. 1983) (citations omitted).

¶22.    To determine whether the PSA at issue is a result of Kim's overreaching, we must examine whether the "agreement is so one-sided and unfair that it could never be considered 'adequate and sufficient,'" and whether the "agreement resulted from an inequality of bargaining power or other circumstances such that there was no meaningful choice on the part of the disadvantaged party." *In re De St. Germain*, 977 So. 2d at 418 (¶21). Similarly, an agreement is substantively unconscionable "when the terms of the agreement are so one-sided that no one in his right mind would agree to its terms." *West*, 891 So. 2d at 213 (¶26). Duress occurs when a party is deprived of the "free exercise of his or her own will." *Est. of Davis v. O'Neill*, 42 So. 3d 520, 525 (¶19) (Miss. 2010). "Duress strikes at whether a party actually consented to a contract." *Id*. As to Glenn's claim for fraud or intentional

9

misrepresentation, he must prove the following elements by clear and convincing evidence:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.

*Saucier v. Peoples Bank of Biloxi*, 150 So. 3d 719, 733-34 (¶71) (Miss. Ct. App. 2014); *see also Gallegos v. Mid-S. Mortg. & Inv. Inc.*, 956 So. 2d 1055, 1059 (¶17) (Miss. Ct. App. 2007).

¶23.    In *Lowrey v. Lowrey*, 919 So. 2d 1112, 1122 (¶38) (Miss. Ct. App. 2005), this Court held that a wife was entitled to relief from the terms of an inequitable PSA due to overreaching.  This Court found that the PSA was "one-sided and unfair" to the wife because of the gross disparity in the child custody award and the division of marital property.  *Id.* at 1121 (¶36).  The terms of the PSA stated that the wife would surrender legal and physical custody of her children, even though the wife had been the children's primary caregiver prior to the divorce.  *Id.*  The wife also received "little to no specified visitation rights with her children."  *Id.*  As for finances, although the wife was unemployed and had no income, she agreed to purchase clothing for the children, pay much of the marital debt, and pay ten percent of her gross income as child support.  *Id.*  The wife also gave up all her marital property except personal items.  *Id.*  In contrast, the husband received the marital home, the equity in the marital home, full legal and physical custody of the children, his retirement funds, and almost all the marital property.  *Id.*

10

¶24. The wife argued on appeal that at the time she signed the PSA, she was in a vulnerable position and lacked bargaining power. *Id*. at (¶37). The record showed that the wife had a gambling addiction that resulted in her losing her job, so she had no money to hire an attorney. *Id*. The wife claimed that her husband threatened that if she hired an attorney, he would "destroy" her and that she would never see her children again. *Id*. The wife asserted that without counsel, she was completely vulnerable and in a state of duress. *Id*. The wife argued that she signed the PSA because her husband threatened to run her out of town and prohibit her from seeing her children unless she signed it. *Id.* Upon review, this Court found that the PSA was unenforceable due to the presence of overreaching and accordingly remanded the matter to the chancellor for a hearing. *Id*. at 1122 (¶39).

¶25. However, in *Smith v. Doe*, 268 So. 3d 457, 464 (¶28) (Miss. 2018), the supreme court found no evidence of unconscionability in a PSA that strongly favored the wife and child. In that case, the husband signed a PSA memorializing that he understood he was assuming more debt and higher alimony and child-support payments than ordinarily required due to the "unique difficulties" in which the husband's behavior had placed the family. *Id*. at 460 (¶4). The supreme court explained that these "unique difficulties" stemmed from the husband's extra-marital affairs, lying about how he had contracted HIV, and allegations of his pedophilic activities. *Id*. The supreme court stated that as a result of the "tremendous guilt and shame for the devastation he caused his family," the husband was "amenable" to the heightened PSA obligations. *Id*.

¶26. The husband eventually moved to set aside the PSA, arguing that the agreement was the result of duress and coercion by his wife and also that the PSA was procedurally and substantively unconscionable. *Id*. at (¶5). The husband claimed that his wife threatened to disclose his affairs, disease, and allegedly improper conduct if he did not sign the agreement, and that she refused to let him have an attorney review the terms of the PSA. *Id*. The husband further asserted that he signed the PSA under duress due to the threat of facing "financial ruin, humiliation, loss of his medical license, criminal prosecution, and loss of contact" with his daughter. *Id*.

¶27. After a hearing on the matter, the chancellor ultimately found no evidence of fraud or overreaching, and he accordingly refused to set aside the PSA. *Id*. at 464 (¶26). The chancellor found that the husband understood and voluntarily accepted the heightened terms of the PSA and that the husband was able to make the monetary payments as stipulated by the PSA. *Id*. at 463 (¶22). As to whether the PSA was unconscionable, the chancellor did not find that the PSA was "so one-sided that no one in his right mind would agree to its terms." *Id*. The husband appealed.

¶28. On appeal, the supreme court affirmed the chancellor's finding that the PSA was not unconscionable. *Id*. at 464 (¶28). The supreme court agreed that just because the wife had "the upper hand in negotiating a favorable settlement did not negate that [the husband] freely and willingly agreed to the settlement's terms." *Id*. at 463 (¶21) (internal quotation marks omitted). The supreme court also agreed that the husband's "self-imposed guilt" and the

12

wife's "obvious hostility" did not "amount to an unconscionable disparity of bargaining power." *Id.*

¶29.    The supreme court additionally found that the PSA was "incredibly clear" and that the PSA emphasized that its terms strongly favored the wife and also explained why. *Id.* at 463 (¶19). The supreme court also found that upon signing the PSA, the parties averred that it was "not entered into as a result of any fraud, duress, misrepresentation, overreaching, coercion, or undue influence." *Id.*

¶30.    In the case before us, the chancellor heard testimony from Glenn and Kim, as well as from the parties' children Hunter and Noel, and Noel's husband, Matt. After hearing the testimony and reviewing the evidence, the chancellor determined that the PSA and waiver of process were not signed "under duress based on misrepresentation and fraud." The chancellor held that the testimony confirmed that Glenn knew of Kim's infidelity; therefore, the evidence failed to support Glenn's claim that he signed the property settlement agreement and waiver based upon Kim's undue influence, misrepresentation, fraud, concealment, duress, and undue methods. The chancellor also found nothing to support Glenn's claim that Kim concealed and misrepresented material facts to Glenn concerning the parties' marriage, property, and debts. The chancellor ultimately denied Glenn's motion to set aside the PSA and waiver of process. The chancellor explained that "because this is an agreement pursuant to a fault ground divorce, the parties are stuck with it and the many problems in its drafting."

¶31.    Our review of the record shows that Glenn testified that after learning that Kim

13

wanted a divorce, he sank into a deep depression and became "hysterical" and "suicidal." According to Glenn, Kim called him three days later and informed him that she had "divorce papers" ready for him to sign. Kim asked Glenn to come to the marital home to sign the papers. Glenn testified that he arrived at the marital home approximately two to three hours later. A notary public and the notary public's son were present. Kim presented Glenn with the PSA and waiver of process, and Glenn signed the documents. Our review of the PSA reflects that it favors Kim. The PSA gives Kim the marital residence, ownership of Glenn's metal businesses, and half of Glenn's retirement. The PSA also provides that Glenn will be fully responsible for all the marital debts.

¶32.    Glenn admitted that he signed the PSA and waiver of process without reading them. Glenn testified that he does not always comprehend what he reads, but he stated that he can understand a document if someone reads it to him. Glenn testified that prior to signing the PSA, neither Kim nor the notary public explained the documents to him. In the order denying Glenn's motion to set aside the PSA and waiver of process, the chancellor found that Kim, the notary public, and the notary public's son had no obligation to advise Glenn of the contents of the PSA. The chancellor also found no evidence to establish that Kim, the notary public, or the notary public's son had any legal expertise.

¶33.    Kim testified at the hearing that she never prevented Glenn from obtaining counsel prior to signing the PSA and waiver of process. Kim stated that if Glenn had informed her that his attorney needed to review the documents before he signed them, she "would have

14

been okay with that." Kim testified that Glenn never told her that he wanted an attorney to review the documents before he signed them. Glenn also acknowledged at the hearing that he could have told Kim that he wanted more time before signing the papers. Glenn admitted that it never occurred to him to do that.

¶34. Kim also testified that Glenn instructed her to have someone prepare the PSA. At the hearing, Glenn admitted that when Kim first informed him she wanted a divorce, he told her, "I'd give you everything I got." Kim explained that as a result, she told her attorney that Glenn wanted Kim to have "everything," and Kim's attorney agreed to draft the PSA. Although Glenn claimed that he signed the PSA and waiver of process at a time when he was hysterical and suicidal, the record contains a hand-written card that Glenn wrote to Kim *after* he signed the PSA confirming that Glenn intended to give Kim "everything [he] own[s]." In the card, Glenn wrote that he never wanted Kim to "worry where the next paycheck [will come from] or how the next bill will get paid."

¶35. The chancellor also found that the evidence showed that Glenn intended to give Kim his businesses. In the above-referenced hand-written card, Glenn told Kim that "[t]he business will have to have help or you can sell it it will be yours [sic]." The record also contains text message conversations between Glenn and Kim in which Glenn represented to Kim that he wanted to get out of the metal business.

¶36. As to Glenn's claim that Kim threatened he would not be allowed to see his grandchildren unless he signed the papers, the chancellor found that Glenn failed to

corroborate this statement, and the record supports this finding. Furthermore, like the PSA in *Smith v. Doe*, the PSA before us states that "each party acknowledges that this Agreement is fair and equitable, and that it is being entered into voluntarily, and that it is not the result of any duress or undue influence."

¶37. After our review, we find that the record supports the chancellor's findings on this issue. Glenn failed to demonstrate that the PSA was unconscionable or that he signed it based on Kim's overreaching, duress, fraud, or intentional misrepresentation. We have held that "[i]n property and financial matters between the divorcing spouses themselves, there is no question that, absent fraud or overreaching, the parties should be allowed broad latitude." *In re De St. Germain*, 977 So. 2d at 419 (¶20). We recognize that "the law favors the settlement of disputes by agreement, and people are free to enter into property settlement agreements—even unfavorable ones. We will not disturb such agreements simply because an agreement is not necessarily in one's best interest." *Id*. at 420 (¶23).

### B. *Essential Elements of a Valid Contract*

¶38. Finally, Glenn argues that the PSA was unenforceable because the PSA lacks the essential elements of a valid contract. *See Rotenberry v. Hooker*, 864 So. 2d 266, 270 (¶13) (Miss. 2003) (setting forth the elements of a valid contract). Specifically, Glenn asserts that there was no meeting of the minds or mutual assent, that the terms of the PSA were not sufficiently definite, and that the PSA was inadequate and insufficient.[3]

---

[3] Glenn argues that the PSA fails to identify or address various items of marital property, including the parties' boat, furniture, tools, golf carts, deer camp, and other real

¶39. The supreme court has provided the following guidance regarding property settlement agreements entered into by the parties and approved by the chancellor:

> In property and financial matters between the divorcing spouses themselves, there is no question that, absent fraud or overreaching, the parties should be allowed broad latitude. When the parties have reached agreement and the chancery court has approved it, we ought enforce it and take as dim a view of efforts to modify it, as we ordinarily do when persons seek relief from their improvident contracts.

*Bell v. Bell*, 572 So. 2d 841, 844 (Miss. 1990).

¶40. In the present case, Glenn and Kim entered into a court-approved contract regarding the disposition of their marital property, including the marital residence and marital debt. After the chancellor denied Glenn's motion to set aside the PSA, the chancellor incorporated the PSA into the judgment of divorce. We recognize that "chancery courts have the power to modify various provisions of a property settlement agreement incorporated into a judgment of divorce where fraud exists or a mutual mistake of fact has occurred in the drafting of the instrument." *Kelley v. Kelley*, 953 So. 2d 1139, 1143 (¶10) (Miss. Ct. App. 2007). We find no evidence of fraud, mutual mistake of fact, or overreaching in this case. *See Ivison v.*

property. Glenn cites the irreconcilable-differences divorce statute, section 93-5-2, and asserts that a divorcing couple must have a meeting of the minds or mutual assent as to "all matters involving . . . property rights between the parties[.]" However, because Glenn and Kim did not obtain an irreconcilable-differences divorce, this statute does not apply to the PSA before us. Furthermore, the PSA contains the following language: "Except as delineated, the personalty in the possession of each respective party shall be that party's exclusive property, and the other party shall relinquish any and all claims to said property." As stated, "[i]n property and financial matters between the divorcing spouses themselves, there is no question that, absent fraud or overreaching, the parties should be allowed broad latitude." *In re De St. Germain*, 977 So. 2d at 419 (¶20).

*Ivison*, 762 So. 2d 329, 334 (¶15) (Miss. 2000).

## CONCLUSION

¶41.    After our review, we find no error.  We therefore affirm the chancellor's judgment granting Kim a divorce on the ground of uncondoned adultery and the chancellor's order denying Glenn's motion to set aside the PSA and waiver of process.

¶42.    **AFFIRMED.**

**BARNES, C.J., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  WILSON, P.J., AND WESTBROOKS, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**